Cal.Rptr. 473]

[Civ. No. 30755.   Second Dist., Div. Four.   Jan. 17, 1968.]

PARAMOUNT TELEVISION PRODUCTIONS, INC., Plaintiff and Appellant, v. BILL DERMAN PRODUCTIONS et al., Defendants and Respondents.

2

Harry P. Warner for Plaintiff and Appellant.

Fendler, Gershon & Warner, Harold A. Fendler and Harry L. Gershon for Defendants and Respondents.

COLLINS, J. pro tem.*—Plaintiff, Paramount Television Productions, Inc., licensee and operator of KTLA television

*Assigned by the Chairman of the Judicial Council.

station, appeals from a judgment rendered in favor of defendants Bill Derman and Bill Derman Productions, a corporation.

The litigation arises out of a letter form of agreement between the parties dated February 1, 1962, as amended July 19, 1962, and July 31, 1962. The text of the agreement, as amended, is set forth in the accompanying footnote,[1] paragraph 4 thereof being recast to show the amendments.

The case proceeded to trial without jury on ten causes of action pleaded in the second amended complaint. Seven of these counts sought recovery of the stipulated weekly royalties on different theories of nonperformance; one cause of action pleaded an open book account; another pleaded an

---

[1]                                                 "February 1, 1962
"Bill Derman Productions
5800 Sunset Blvd.
Hollywood 28, California
Gentlemen:
  This will confirm the understanding and agreement between Paramount Television Productions, Inc. (hereinafter referred to as 'Station') and Bill Derman Productions (hereinafter referred to as 'Producer').
  1. Station agrees to furnish below the line facilities for a taped pilot entitled 'Shopping Spree' to be produced by Producer.
  2. Producer shall furnish and pay for all 'above-the-line' elements and costs as that term is generally understood in the industry except the staff announcer which will be furnished by Station. Station will also furnish the director as part of the 'below-the-line' facilities.
  3. Station shall furnish tape stock for this pilot and said stock shall remain the property of Station. Producer may purchase the tape at cost. Station agrees to hold the tape for a period of thirty (30) days.
  4. In the event that there is a network or syndicated sale of the program, as that term is generally understood in the television industry, Station shall receive the sum of Seven Hundred and Fifty Dollars ($750.00) per week for so long as the series based on the pilot program is distributed. The terms and provisions of the foregoing sentence only apply if a network or syndicated sale is made prior to August 1, 1963. If, however, a network or syndicated sale is effected after August 1, 1963, Producer will reimburse Station in the amount of One Thousand and Fifty Dollars ($1,050.00).
  5. Station will furnish three kinescopes for sales purposes.
  6. In the event that a series results from this pilot, said series will be taped using Station's facilities and Producer will be charged the standard rates which Station charges other producers renting its facilities.
  If this effectuates our understanding and agreement, please sign in the space provided below.
                                        Sincerely,
                                        /s/ Harry P. Warner
                                        Harry P. Warner
HPW:ds
AGREED TO AND ACCEPTED:
BILL DERMAN PRODUCTIONS
/s/ Bill Derman
Bill: Paragraph 6 is a best efforts clause because NBC may require as part of a network deal, that the show be taped there.''

account stated. A tenth cause of action pleaded "a further oral and contemporaneous understanding." Following the entry of judgment, and at the time a motion for new trial was argued, the court denied plaintiff's motion for leave to amend to conform to proof by a proposed eleventh cause of action which pleaded the same purported oral and contemporaneous understanding alleged in the tenth cause of action. Plaintiff has characterized the tenth and eleventh causes of action as "two alternative and inconsistent causes of action seeking recovery for services via quantum meruit or quantum valebant." In both of these causes of action it is alleged that "further oral and contemporaneous understandings" attended the February 1, 1962 agreement to the effect that the stipulated royalties would be payable to plaintiff in case defendants, acting in the capacity of a "packager," as the term is understood in the television industry, would thereafter "package" and program for a network or syndicator a television series based on the pilot "Shopping Spree."

On February 1, 1962, when the parties signed the letter agreement they did not meet as strangers nor did they deal as amateurs with respect to the marketing of television material. Beginning as early as June 1961 they were negotiating for an agreement under which plaintiff's station KTLA would telecast a game-show created by Bill Derman called "Beat The Odds." On June 29, 1961, plaintiff submitted a preliminary form of letter agreement which was followed by an exchange of teletypes and finally culminated in a formal agreement dated January 1, 1962, comprising 13 typewritten pages. Successive drafts of the contract documents contained provisions relating to a "national network sale" by the producer of the program, which provisions were carried into the formal agreement.

The "Beat The Odds" agreement provided that, in the event of a national network sale, plaintiff's station KTLA would receive guaranteed royalties and minimum percentages of the revenue received by the producer pursuant to a formula. In this respect it differed from the "Shopping Spree" agreement which provided only for the payment of a flat fee.

Defendant Derman testified that, in his discussion with Robert Quinlan, KTLA program manager, several weeks prior to February 1, 1962, he proposed the same kind of a deal respecting "Shopping Spree" as the parties had made with

respect to "Beat The Odds," and that Quinlan had said "Okay." Elliot Wax, Derman's personal representative at the William Morris Agency, corroborated him, stating further that his discussion with Mr. Quinlan and Mr. Warner, plaintiff's attorney, contemplated a formal agreement basically the same as the "Beat The Odds" agreement except that a flat fee instead of a percentage would be payable in the event of a network sale. At trial Mr. Quinlan denied any such understanding, adding that he would not have dealt on that basis. His deposition, taken prior to trial, is less positive in that regard. Derman testified that the letter agreement was submitted to him by plaintiff's attorney, Mr. Warner, on February 1, 1962, less than two hours before actual taping of the program commenced, that he objected to its form, stating that it was not what Mr. Quinlan had agreed upon with him; that he and Warner went to see Quinlan, and Derman repeated to Quinlan his complaint that the agreement did not resemble the previous "Beat The Odds" agreement. At that time Quinlan told him that they would have to have his signature before he could start taping, that the document was not the regular contract, that additions would be made and he would receive the regular contract later. From time to time thereafter Derman would see Warner at the station and would ask when the contract would be ready; that Warner offered excuses that he was busy but that Derman would receive the contract, "that it was a matter of waiting." No so-called "regular contract" relating to "Shopping Spree" was received thereafter. Defendant proceeded to shoot the pilot at KTLA and, within approximately one week after February 1, 1962, Derman received from plaintiff a kinescope of the pilot program which he planned to take to New York to present to NBC. He asked Mr. Adler, KTLA General Manager, and Mr. Quinlan if plaintiff would pay his plane fare to New York for this purpose. They reminded him that he was the packager and travel expenses were his own obligation. Derman made the New York trip but his efforts to sell the pilot to NBC failed. Instead, NBC agreed to make a new pilot at its own expense and to take an option for Derman to package and produce "Shopping Spree" for its network. Delay in making the NBC pilot developed when NBC learned that third persons were asserting claims to some elements of the plot. This problem was resolved by obtaining indemnification insurance to protect NBC in case of litigation. A color pilot of "Shop-

ping Spree'' was finally made at NBC on July 14, 1962. Derman testified that, in accordance with standard practice, NBC had a six or nine months' option to buy the pilot after it was completed, but NBC never exercised its option. Instead, it turned over to Derman the color tape for his use in developing a sale to another network or syndicate.

In April 1963 defendants submitted the NBC pilot of ''Shopping Spree'' to ABC, whose representative rejected it on the stated ground that it conflicted with another ABC show called ''Window Shopping.'' Thereafter, unsuccessful attempts were made to sell the package to the CBS network. Still later unsuccessful efforts were made to interest United Artists in syndicating the show. Finally, in June 1963, Elliot Wax, defendants' representative at the William Morris Agency, told Derman that on the basis of reaction received they ''weren't able to move the show.'' However, shortly thereafter Mr. Wax learned that another client of the William Morris Agency, Mr. Mervin Griffin, was interested in doing a word-game show or an anagram show. Wax suggested to Griffin that he might purchase the rights to Derman's word-game, *i.e.*, ''Shopping Spree,'' and that in this manner he could protect himself against lawsuits by outsiders who might claim that he took the show from them, because the prior existence of Derman's property could be verified by the fact that he had a pilot deal with NBC and the property had been in the latter's hand for approximately one year. Then followed negotiations between defendants and Griffin's Mertone Music, Inc. which culminated in a lengthy agreement dated August 7, 1963, whereby Derman transferred to Mertone certain segments of the ''Shopping Spree'' plot but reserved to Derman ''the sole and exclusive right to utilize and exploit in any form or manner and at any present or future television program created by him that segment and portion of his television program, idea and format, relating to the selection of merchandise by winning contestants, designated as the 'Shopping Spree' portion of the program, together with the sole and exclusive right to use the title 'Shopping Spree' in connection therewith.'' The agreement also provided that Derman would receive visual credit on each program in the following form: ''CREATED BY BILL DERMAN.'' The agreement provided for a 10-year license and for the payment to Derman of specified royalties for various types, times and places of television and radio broadcasting. It contained no

provision permitting, requiring or contemplating that Derman would serve as packager, producer, director or in any other functional capacity with respect to Mertone's utilization of its license. The agreement contained a provision that if Derman should be required to pay Paramount Television Productions, Inc. any sums "arising from or with respect to the broadcasting of television programs based upon the property," Mertone would pay Derman additional amounts not to exceed $250 a week. Mr. Wax testified that this so-called "indemnification clause" was included in the agreement because, in the opinion of Derman's counsel, there was some question that Derman might be liable to KTLA under his agreement with plaintiff, and counsel wanted to be sure that Derman was protected in such event, so that the liability would not have to be met entirely out of his funds. Thereafter, Mertone Music produced a program which utilized only the "word portion" of defendants' material. It was telecast over NBC facilities under the title "Word For Word" for a period of 56 weeks. It is on the basis of this performance that plaintiff claims royalties at the rate of $750 a week for 56 weeks, totalling $42,000.

In its opening brief, plaintiff asserts that "the primary issue tendered by this appeal is the meaning and understanding to be given the phrase 'network or syndicated sale'." To support its contention that a sale equates with an "airing or exhibition" of a series, KTLA's program manager, Mr. Quinlan, testifying as an expert, stated that such was his understanding of the term, and that the licensing of a program is encompassed by the exhibition or broadcast of a program. On cross-examination he testified further that a "packager" usually is the producer of a program; that "he supplies the creative end of the program, precisely the idea of the program"; that sometimes the packager assigns some of his responsibilities to a "producer." The testimony of Mr. Adler, plaintiff's general manager, was presented by deposition. It was substantially in agreement with Mr. Quinlan's testimony on the meaning of network and syndicated sales. Mr. Adler stated that a packager may make a deal to be paid a flat sum or on a percentage basis, "that practically every deal is unique unto itself. There are very few stock formulas in our business. There are always slight variations."

Mr. Dixon Dern, employed by United Artists Television as its West Coast counsel and previously employed by Desilu as

resident counsel and even earlier by CBS Television Network as associate West Coast counsel, was offered by plaintiff as an expert witness on the basis of his background in negotiating and drafting various classes of agreements for television production and distribution. In response to a question as to the meaning in the industry of a network or syndicated sale he answered that ". . . a sale of a television program would be a sale by the producer or his intermediary, sales agent, or assignee or licensee, if he is not directly engaged" to a network or a network sponsor or in case of a syndicated sale to a regional market or on a station-to-station basis. On cross-examination Mr. Dern stated that in the television industry the terms "producer" and "packager" are frequently used synonymously; that in the case of a network sale generally "the packager is responsible for garnering the rights, producing it and delivering it to the network"; that the arrangements may vary from package to package, that generally a producer/packager supplies "what we call below-the-line elements, the so-called facilities and whatever above-the-line elements are contracted for, such as actors, writers, and rights, the basic properties"; that when a contract is made to deliver a program an over-all package fee is paid to the packager for the program.

All persons who participated in the negotiations leading to the agreement of February 1, 1962, uniformly testified that at no time was there any discussion about any payment to plaintiff in case Derman should sell any of the elements of his program to someone who was neither a network operator nor a syndicator. In the words of Mr. Wax of the William Morris Agency it wasn't discussed "because it was never contemplated."

In the foregoing summary of the highlights of the evidence, no reference has been made to the content of the three programs, namely, the KTLA pilot, the NBC pilot, and the Mertone Program. The court has not read or compared them nor acceded to the request that it have them screened for the purposes of verifying the substantial similarities asserted by plaintiff. Assuming, *arguendo*, that they are substantially similar, the court regards this as irrelevant in view of its determination of other issues in the case.

Before treating directly what plaintiff characterizes as "the primary issue," namely, the meaning of the phrase "network or syndicated sale," it is in order to consider and resolve

what plaintiff's brief characterizes as a "crucial issue," namely, the trial court's asserted error in permitting defendants to introduce parol evidence to modify and vary the terms of the written agreement of the parties.

Plaintiff's position on this point appears equivocal, if in fact not contradictory. At trial it was plaintiff which first offered parol evidence in the form of testimony of experts in the television industry as to the meaning of contract terms. When defendants objected to questions put to plaintiff's expert witness, Dern, plaintiff's counsel indicated that he was seeking to show the witness' "knowledge of trade practice." The trial judge reminded counsel of the position taken by plaintiff at pre-trial hearing and during the trial that parol evidence was not admissible to alter, modify, change or interpret the agreement; and the judge made the cautionary observation that counsel might be "opening the door up." Plaintiff's counsel acknowledged that he might be "trying to talk out of both sides of my mouth at the same time" but that paragraph 4 of the agreement referred to "a network or syndicated sale of the program as that term is generally understood in the television industry." It may be noted that had the court upheld plaintiff's invocation of the parol evidence rule, plaintiff would have effectively maneuvered itself into a nonsuit because the agreement on its face creates no contractual commitment referrable to the factual situation presented at trial. However, the court permitted both sides to present evidence *aliunde* the agreement, in order to ascertain the meaning of the language used in the agreement.

Defendants' position, as presented by the testimony of its witnesses, and supported in part by witnesses produced by plaintiff, was that the expression "network or syndicated sale, as that term is generally understood in the television industry" did not embrace or contemplate an agreement of the character made by defendants with Mertone Music.

In plaintiff's reply brief and also at oral argument in this court, plaintiff's counsel contended that at trial defendants' counsel *stipulated* that a writer's sale of a program to a network "means that the program is going to be exhibited over the network." On this basis plaintiff argues that "sale" equates with "exhibition." This is a nonsequitur. Furthermore, the colloquy between counsel during the course of Mr. Derman's cross-examination, out of which the so-called stipulation arose, when read with the context, does not support

plaintiff's claim that the stipulation requires a finding favorable to plaintiff on the issue. Actually, at trial neither the litigants nor the court treated it as establishing anything definitive.

Plaintiff argues that we are entitled, yea required, to take judicial notice that in the television industry a network sale means a network exhibition in the sense that the two terms are interchangeable. Counsel has been industrious in researching extra-judicial writings, industry panel discussions, an appellate court brief by defendants' counsel in earlier unrelated litigation (*Kurlan* v. *C.B.S.,* D.C.A.2d Civ. 16859 (1952)), the Federal Communications Commission's Second Interim Report On Television Network Program Procurement, and other administrative agency literature. Plaintiff cites California Evidence Code, section 451, subdivision (f) which provides that judicial notice shall be taken of: "Facts and propositions of generalized knowledge that are so universally known that they cannot reasonably be the subject of dispute." Quite apart from the fact that the Evidence Code, enacted in 1965, by its express provision (Evid. Code, § 12) did not become operative until January 1, 1967, more than 21 months after the commencement of the trial in the cae on March 22, 1965, yet assuming that the law then applicable was compatible with section 451 of the Evidence Code (see Comment, Evid. Code, § 451; Witkin, Cal. Evidence (2d ed.) § 153), nevertheless none of the cited literature constitutes matters of "generalized knowledge . . . so universally known that they cannot reasonably be subject of dispute." Contrariwise, the record in this case shows that there is little that is universally known but much that is subject of dispute and differing shades of meaning. (See *Sharpe* v. *Arabian American Oil Co.* (1952) 111 Cal.App.2d 99, 104 [244 P.2d 83].) In these circumstances there is no need to analyze or differentiate cases cited by plaintiff with respect to the application of the parol evidence rule. It is sufficient to say that they are inapplicable. ■ This case falls within the rule applied in *Ermolieff* v. *RKO Radio Pictures, Inc.* (1942) 19 Cal.2d 543, at page 550 [122 P.2d 3] : "The correct rule with reference to the admissibility of evidence as to trade usage under the circumstances here presented is that while words in a contract are ordinarily to be construed according to their plain, ordinary, popular or legal meaning, as the case may be, yet if in reference to the subject matter of the contract, particular

expressions have by trade usage acquired a different meaning, and both parties are engaged in that trade, the parties to the contract are deemed to have used them according to their different and peculiar sense as shown by such trade usage. Parol evidence is admissible to establish the trade usage, and that is true even though the words are in their ordinary or legal meaning entirely unambiguous, inasmuch as by reason of the usage the words are used by the parties in a different sense. (See Code of Civil Procedure, § 1861; Civil Code, §§ 1644, 1646, 1655; *Jenny Lind Co.* v. *Bower & Co.*, 11 Cal. 194; *Callahan* v. *Stanley*, 57 Cal. 476; *Higgins* v. *California Petroleum etc. Co.*, 120 Cal. 629 [52 P. 1080]; *Caro* v. *Mattei*, 39 Cal.App. 253 [178 P. 537]; Wigmore on Evidence, vol. IX, § 2463, p. 204; Restatement, Contracts, §§ 246, 248; 89 A.L.R. 1228.) The basis of this rule is that to accomplish a purpose of paramount importance in interpretation of documents, namely, to ascertain the true intent of the parties, it may well be said that the usage evidence does not alter the contract of the parties, but on the contrary gives the effect to the words there used as intended by the parties. The usage becomes a part of the contract in aid of its correct interpretation.''

All of the challenged parol evidence and other evidence aliunde the written agreement, having been properly admitted by the court,[2] it was the function of the trial judge to resolve all conflicts and make findings thereon. This the court did in findings Nos. 5 and 5A as follows:

''5. The term 'network or syndicated sale . . . as that term is generally understood in the television industry' refers to a contract entered into by a 'packager' directly with a network or syndicator, by the terms of which contract such packager agrees to package and produce a television series for such network or syndicator.''

''5 A. It was at all times mutually intended and understood by the parties that payment should and would be made to the plaintiff solely in the event that defendants or either of them acting in the capacity of a 'packager' should thereafter enter

---

[2] *Alperson* v. *Mirisch Co.* (1967) 250 Cal.App.2d 84 [58 Cal.Rptr. 178], Hrg. den. by Sup. Ct. is a recent case in which the court admitted parol evidence to establish a trade usage in the motion picture industry, even though the words in their ordinary or legal meaning were entirely unambiguous. The court held that where such extrinsic evidence is in conflict, any reasonable construction by the trial court will be sustained, citing *Collins* v. *Home Sav. & Loan Assn.*, 205 Cal.App.2d 86, 101 [22 Cal.Rptr. 817].

into a contract directly with a network or syndicator by the terms of which contract defendants or either of them would 'package' and produce for such network or syndicator a television series based upon the pilot produced and taped at KTLA.''

Plaintiff argues that this appellate court is required to independently interpret and construe the agreement of the parties, citing the case of *Parsons* v. *Bristol Dev.* (1965) 62 Cal.2d 861 [44 Cal.Rptr. 767, 402 P.2d 839]. We regard plaintiff's reliance therein as misplaced. In the *Parsons* case the Supreme Court took note that, since there had been confusion concerning the rules of appellate review of the interpretation of written instruments, it was appropriate to define the scope of such review, which the court did in the following language (62 Cal.2d at pp. 865, 866) : ''The interpretation of a written instrument, even though it involves what might properly be called questions of fact (see Thayer, Preliminary Treatise on Evidence, pp. 202-204), is essentially a judicial function to be exercised according to the generally accepted canons of interpretation so that the purposes of the instrument may be given effect. (See Civ. Code, §§ 1635-1661; Code Civ. Proc. §§ 1856-1866.) Extrinsic evidence is 'admissible to interpret the instrument, but not to give it a meaning to which it is not reasonably susceptible' (*Coast Bank* v. *Minderhout*, 61 Cal.2d 311, 315 [38 Cal.Rptr. 505, 392 P.2d 265]; *Nofziger* v. *Holman*, 61 Cal.2d 526, 528 [39 Cal.Rptr. 384, 393 P.2d 696]; *Imbach* v. *Schultz*, 58 Cal.2d 858, 860 [27 Cal.Rptr. 160, 377 P.2d 272]), and it is the instrument itself that must be given effect. (Civ. Code, §§ 1638, 1639; Code Civ. Proc., § 1856.) It is therefore solely a judicial function to interpret a written instrument *unless the interpretation turns upon the credibility of extrinsic evidence.* Accordingly, 'An appellate court is not bound by a construction of the contract based solely upon the terms of the written instrument without the aid of evidence [citations], *where there is no conflict in the evidence* [citations], or a determination has been made upon incompetent evidence [citation].' (*Estate of Platt*, 21 Cal.2d 343, 352 [131 P.2d 825]. Accord, *Moore* v. *Wood*, 26 Cal.2d 621, 629-630 [160 P.2d 772]; *Western Coal & Min. Co.* v. *Jones*, 27 Cal.2d 819, 826-827 [167 P.2d 719, 164 A.L.R. 685]; *Estate of Wunderle*, 30 Cal.2d 274, 280 [181 P.2d 874]; *Estate of Fleming*, 31 Cal.2d 514, 523 [190 P.2d 611]; *Meyer* v. *State Board of Equalization*, 42 Cal.2d 376, 381 [267 P.2d 257].)

"'It is true that cases have said that *even in the absence of extrinsic evidence the trial court's interpretation of a written instrument must be accepted 'if such interpretation is reasonable, or if [it] is one of two or more reasonable constructions of the instrument'* (*Prickett* v. *Royal Ins. Co.*, 56 Cal.2d 234, 237 [14 Cal.Rptr. 675, 363 P.2d 907, 86 A.L.R.2d 711]; *Lundin* v. *Hallmark Productions, Inc.* 161 Cal.App.2d 698, 701 [327 P.2d 166]), or if it is 'equally tenable' with the appellate court's interpretation (*Estate of Northcutt*, 16 Cal.2d 683, 690 [1^7 P.2d 607]; accord, *Estate of Cuneo*, 60 Cal.2d 196, 201 [32 Cal.Rptr. 409, 384 P.2d 1]). Such statements are not in conflict with *Estate of Platt, supra*, 21 Cal. 2d 343, if they are interpreted, as they should be, to mean only that *an appellate court must determine that the trial court's interpretation is erroneous before it may properly reverse a judgment.* (See *Estate of Shannon*, 231 Cal.App.2d 886, 893 [42 Cal.Rptr. 278].) They do not mean that the appellate court is absolved of its duty to interpret the instrument." (Italics added.) Plaintiff's reliance on the *Parsons* opinion is misplaced in that it ignores the underscored portions of the opinion, *supra*, which indicate that, in the context of this case, the trial court's interpretation must be accepted where, as we here determine, "interpretation turns upon the credibility of extrinsic evidence" and "the interpretation is reasonable."

Plaintiff attacks the trial court's finding No. 12, which reads as follows:

During the months of June and July, 1963, negotiations were undertaken by defendant Bill Derman individually to license the program format and title of 'Shopping Spree' and the right to utilize the same or portions thereof in a television program series to one Merv Griffin, or Mertone Music, Inc., a corporation owned or controlled by Griffin, and although tentative agreement was reached upon some of the principal points involved in such negotiations on or about June 10, 1963, said agreement was not completely consummated or executed prior to the 7th day of August, 1963 (plaintiff's Exhibit 17)."

While it is true that defendants' agreement with Mertone Music, Inc. was executed on August 7, 1963, seven days after the cut-off date fixed in defendants' agreement with plaintiff, plaintiff makes no charge and offered no evidence that delays beyond August 1st were the result of some fraud or were in

any wise contrived. So far as it appears from the record the delay was incident to normal negotiations.

Plaintiff contends that the "indemnity provision" in the Mertone Music, Inc. agreement (that the royalty payable to Derman would be increased by $250 a week in case the latter should be obligated to pay any sums to plaintiff) constitutes an admission of liability on the part of defendants to plaintiff. The trial court received evidence as to the motivation for this provision and Derman's offer at one time to pay plaintiff $250 a week "because he wanted to stay on good terms with KTLA."[3] The court concluded as a matter of law that the indemnity provision coupled with defendants' conduct did not constitute an admission of liability. The finding is amply supported by the evidence; we find no error in the determination. At most it was akin to an offer of compromise, which under section 2078 of the Code of Civil Procedure "is not an admission that anything is due."

Finally, plaintiff claims errors resulted from the trial court's failure to grant relief on the so-called "alternative and inconsistent causes of action seeking recovery for services via quantum meruit or quantum valebant," and that procedural error resulted from the court's refusal to permit plaintiff to add the proposed eleventh cause of action. Recovery on either of these causes of action would require a finding that defendants packaged and programmed a television series based on the pilot of "Shopping Spree." Since the court properly found that the evidence did not establish this predicate of liability, no error resulted, and there could be no recovery under the "further oral and contemporaneous understanding of the parties" pleaded in said tenth and eleventh causes of action for the same reasons that there can be no recovery on the written agreement of February 1, 1962, as amended.

The judgment is affirmed.

Files, P. J., and Kingsley, J., concurred.

---

[3] It is worthy of note that during the period Derman's "Beat The Odds" program was being telecast weekly by KTLA, but the contract was terminated by plaintiff within a week after it was informed that Derman denied liability under the February 1, 1962, agreement.