[Civ. No. 12241. Third Dist. May 15, 1972.]

CHARLES B. SECK, Plaintiff and Appellant, v.
GEORGE W. FOULKS et al., Defendants and Respondents.

## COUNSEL

Dahl, Hefner, Stark & Marois, John D. Bessey and C. Afton Moore III for Plaintiff and Appellant.

William A. Sitton and Robert C. Cook for Defendants and Respondents.

## OPINION

**JANES, J.**—Plaintiff appeals from an adverse judgment by the court rendered pursuant to Code of Civil Procedure section 631.8 in an action by plaintiff against defendants seeking payment of a real estate broker's commission. Defendant George W. Foulks at all relevant times had full authority to act for and appeared on behalf of his parents, defendants Guy G. Foulks and Elizabeth Foulks; we will use the name "Foulks" to refer to George W. Foulks, the principal defendant in the action.

### FACTS

Plaintiff Charles Seck, a licensed real estate broker and longtime acquaintance of defendant Foulks, was approached by Foulks in early March 1965 with reference to sale of the Foulks' ranch in Sacramento County. A week after their initial encounter, Seck visited Foulks' office in Sacramento and Foulks asked Seck to ascertain a reasonable selling price for the ranch property. Seck received Foulks' oral assurance that Foulks would not deal with another real estate broker, since Seck anticipated the expenditure of time and money.

Seck then conducted an investigation to determine the value of the property. He returned to Foulks' office a week later and reported that $2,000 per acre would be a reasonable selling price and Foulks agreed that figure was reasonable.

Foulks then told Seck the terms upon which he would sell the property; he declined, however, to give Seck a "formal" listing agreement. The reason expressed by Foulks for his persistence in refusing to execute a formal agreement was that "I'd have all my neighbors down on me for having raised the value of their property by virtue of the listing." Despite Seck's assurances to the contrary, Foulks stated: "I want to do it that way," and "You know dog gone well, you know me, and I'm not going to cheat you out of a commission."

Seck, knowing that he had to have a written contract in order to collect a commission on the sale of real estate, marked down, on the back of one of his regular business cards, the terms discussed with Foulks; he then handed the card to Foulks, who at Seck's request, initialed and dated it.[1] Foulks then copied the data onto a piece of paper of his own and, at his request, Seck also initialed Foulks' memorandum of the terms.

The meaning of the terms and symbols on Seck's business card—as explained by the testimony of Seck and accepted by the trial court—was as follows: "310 M/L" meant there were 310 acres "more or less" that were to be sold. The "2000 per acre" meant that "we were offering the property at $2,000 per acre." "½ down" meant that one-half of the amount of the principal was to be paid into escrow; "bal 5 years" indicated that the balance was to be payable "over a period of five years on a deed of trust." The "5%" was the interest to be charged on the deed of trust. The line "quarterly with int" meant that quarterly payments were to be made on the deed of trust, with interest at 5 percent. "½ mineral rights" was intended to reserve one-half of the mineral rights on the property to the seller. The symbol "6% comm." meant that Foulks would pay Seck a 6 percent commission, and the date "10/1/65" fixed the termination date (rounded off) of the six months' period given Seck to handle the sale. The first word, "Sitten" (a misspelling of "Sitton") was an indication that "the documents had to be presented to [Mr. Sitton, Foulks' attorney] for legal

---

[1]The notations on the reverse of the card (plaintiff's exhibit 1) appear as follows:

"Sitten
310 M/L
2000 per acre
½ down
bal 5 years
5% int
quarterly with int
"keep taxes up to date
½ mineral rights
6% comm.
10/1/65
"GWF"

interpretation on "any deal" that Seck brought to Foulks. The date of the conversation and notation "3-24-65" and the initials "GWF" were placed on Seck's business card by Foulks, as we have emphasized (see fn. 1).[2]

As the trial court found, Seck then began an extensive campaign to sell the property. He secured a title report and employed an engineering firm which prepared maps of the property. He drafted and mailed out numerous letters, printed advertising flyers, and prepared a detailed brochure which he furnished to persons and firms expressing an active interest in the property. The documents described the property, emphasizing its desirable location and other strong selling points; one of the documents bore reference to "Charles B. Seck" as "Exclusive Agent;" another on its attractive cover sheet a large caption: "CHARLES B. SECK, realtor." Foulks was aware of the efforts and contacts being made by Seck: He was given copies of the advertising literature designating Seck as "Exclusive Agent," and was shown a copy of the brochure naming Seck as "realtor" on the proposal. Foulks, in fact, on one occasion, called Seck and referred to him a couple who had indicated an interest in purchasing the property.

During the course of his efforts, Seck contacted, among others, Richard Ohm, who acted as broker for the real estate development firm of Walker & Donant. Ultimately, on August 20, 1965, Walker & Donant, through Ohm, put up $10,000 and executed a deposit receipt to purchase the property, accompanied by a proposed purchase agreement. The offer was delivered to Foulks who in turn referred it to his attorney, Sitton. The offer was not aceptable to Foulks, however, because it did not conform to the terms initially proposed by him.

Because of difficulties encountered in communicating with Foulks and Sitton, Walker & Donant on September 21, 1965, retained attorney Burke, as its attorney in an attempt to negotiate with Foulks and Sitton for consummation of the purchase. After Burke met with Sitton, Sitton prepared a list of eight objections to the proposed agreement.

On September 23, Burke and Sitton met separately from the parties in order to review the proposed contract and work out an agreement mutually acceptable to the parties. At that time the attorneys reviewed the list of objections posed by Sitton. The second objection was "Commission payments with respect to the sale

---

[2]Foulks, called to the witness stand by plaintiff, admitted initialling and dating the memorandum but denied, in substance, Seck's testimony concerning the purpose and interpretation of the memorandum, and he specifically denied employing Seck or agreeing to pay him a commission. *Foulks'* copy of the memorandum was not produced at trial, although demand therefor was made by plaintiff. Foulks denied making the copy. According to his testimony it was Seck—not Foulks—who made a copy of the memorandum, and Seck "signed the copy to me [Foulks], which I can't find."

should be placed upon an installment basis, to be paid proportionately at such times as seller receives payment on account of purchase price."[3] Both attorneys agreed, however, that this objection was a matter more properly left to the "agents," co-brokers Seck and Ohm, and that it should be handled as a separate matter. A notation to this effect was made on the list of objections. After the meeting, Burke redrew the proposed purchase agreement in accordance with his and Sitton's discussion and sent a copy of the new proposed agreement to Sitton in anticipation of a meeting with the parties.[4]

Finally, on September 28, 1965, all parties met in Sitton's office. The expressed purpose of the meeting was to reach a final agreement on the sale of the property. The parties discussed and agreed upon the terms and conditions of the redrafted agreement, which had already been signed by Mr. Donant for the buyers. Sitton indicated to Foulks his approval of the agreement for Foulks' signature. Foulks' only expressed reservation was his desire "as a matter of courtesy" to communicate to his parents, who lived on the property, the facts concerning a life estate reserved to them by the agreement. Before the meeting adjourned, the question was put to the parties, "Do we have an agreement?" Foulks replied, "Yes, you have an agreement." The parties then stood up and shook hands.[5] All that remained to be done was for Foulks to affix his signature to the agreement after reporting to his parents, and to return the agreement to Burke. Sitton was also to designate to Burke which title company he wished to use, which Sitton did a short time later.

At the conclusion of the meeting, Sitton requested Seck and Ohm, the brokers, to remain for a few minutes. After all other participants in the meeting (including Foulks) had left Sitton's office, Sitton asked the brokers to take their commission in installments, stating that "Mr. Foulks shouldn't pay this commission in cash." Seck and Ohm declined to do so.[6]

---

[3]After presentation of the initial Walker & Donant offer, Foulks had raised with Seck for the first time the question of how the real estate commission would be paid. Foulks expressed a desire to make the payment of Seck's commission as the principal from the sale was paid to him, whereas Seck wanted a cash commission paid out of escrow. The two finally agreed to leave the matter up to Foulks' accountant. (There is no indication in the record that the accountant at any time ever made a recommendation in the matter.)

[4]Meanwhile, on September 25, Foulks had called Seck and asked him how much Seck would charge to handle *another* deal for cash with a different buyer of the *same* property. Seck refused to discuss the proposition while the transaction with Walker & Donant was pending.

[5]The matter of the real estate commission and the manner of its payment was not discussed during the course of the meeting.

[6]Both brokers testified, however, that had they known or been informed that the transaction would stand or fall on the manner in which the commission was paid they would have acceded to Sitton's request.

Nothing was heard thereafter from Sitton or Foulks, nor did Foulks ever sign and forward a copy of the agreement to the buyers. Although both Burke and the buyers sought an explanation from Foulks and Sitton, no explanation was ever given except that the property had been sold to other buyers.

## SUFFICIENCY OF THE "CALLING CARD MEMORANDUM"

█ Before turning to plaintiff's contentions on this appeal, we dispose of defendant's attack upon the trial court's finding that the memorandum (referred to by the parties and sometimes herein as the "calling card memorandum") constituted a "written listing of defendant's property with plaintiff as Broker for sale upon the terms and conditions therein set forth."

It is defendant's position that the memorandum made by Seck and initialed and dated by Foulks does not meet the requirements of the statute of frauds,[7] and that this court is required to make an independent interpretation and determination of the sufficiency of the questioned memorandum.

As authority for his contention, Foulks relies upon the oft-cited case of *Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861 [44 Cal.Rptr. 767, 402 P.2d 839] and kindred cases. *Parsons* lays down the proposition that the interpretation of a written instrument, although involving questions of fact, is essentially a judicial function. (*Id.* at p. 865.) Recognizing, however, that the interpretation of a written instrument sometimes involves the admission of extrinsic evidence, *Parsons* itself limits application of the general proposition stated to those cases, inter alia, in which interpretation of the written instrument does not turn upon the credibility of extrinsic evidence. █ Thus the complete rule, as stated in *Parsons,* at page 865, is that " '[a]n appellate court is not bound by a construction of the contract based solely upon the terms of the written instrument without the aid of evidence [citations], where there is no conflict in the evidence [citations], or a determination has been made upon incompetent evidence [citation].' (*Estate of Platt,* 21 Cal.2d 343, 352 [131 P.2d 825].)" (See *Estate of Dodge* (1971) 6 Cal.3d 311, 318 [98 Cal.Rptr. 801, 491 P.2d 385].)

---

[7]At the time here relevant, Civil Code section 1624, subdivision 5, provided in part as follows:

"The following contracts are invalid, unless the same, or some note or memorandum thereof, is in writing and subscribed by the party to be charged or by his agent: . . .

". . . . . . . . . . . . . . . . . . . . . . .

"5. An agreement authorizing or employing an agent, broker . . . to purchase or sell real estate, . . . for compensation or a commission; . . ."

In view of *Parsons,* it is at once apparent that this court has neither the duty nor the right to look beyond the trial court's finding in the case at bench. Here, on conflicting evidence which we have summarized above, the trial court made an express finding that the memorandum on the reverse of Seck's business card "constituted a written listing of defendant's property with plaintiff as broker for sale upon the terms and conditions therein set forth; . . ."[8]

Defendant makes a separate attack, however, on the claimed failure of the calling card memorandum to show on its face the *fact of employment* of Seck to act for Foulks. Indicative of defendant's position is the following statement from *Franklin* v. *Hansen* (1963) 59 Cal.2d 570 [30 Cal.Rptr. 530, 381 P.2d 386]: "Written evidence of the employment relationship has always beeen deemed an essential requirement of the statute of frauds. In addition to the *Pacific Southwest Dev. Corp.* case [*Pac. etc. Dev. Corp.* v. *Western Pac. R. R. Co.* (1956) 47 Cal.2d 62 (301 P.2d 825)], *supra,* other decisions have held that the failure to expressly provide for employment is fatal to the sufficiency of any memorandum. Thus, in *Morrill* v. *Barneson,* 30 Cal.App.2d 598 [86 P.2d 924], a letter which fully described the property, the sale price and terms thereof, and provided for the payment of the 'regular 5% commission,' was held insufficient because it failed to expressly create an employment relationship with anyone. In *Herzog* v. *Blatt,* 80 Cal.App.2d 340 [180 P.2d 30], a memorandum in the form of an offer to accept '8400 net' for designated property was also held insufficient because it too failed to authorize anyone to act for the owner. And in *Kleinsorge & Heilbron* v. *Liness,* 17 Cal.App. 534 [120 P. 444], a writing setting forth the price, terms and description of property offered for sale by the signer thereof, which writing was delivered to the plaintiff real estate brokers although not expressly addressed to them, was held insufficient as not bearing written evidence of a contract of employment or authorization. For the proposition that a sufficient writing 'must unequivocally show on its face the fact of employment of the broker' see also *Blanchard* v. *Pauley,* 92 Cal.App.2d 244, 247 [206 P.2d

---

[8]The authorities cited by defendants (*Kurland* v. *United Pac. Ins. Co.* (1967) 251 Cal.App.2d 112 [59 Cal.Rptr. 258]; *Integrated, Inc.* v. *Alec Fergusson Electrical Contractor* (1967) 250 Cal.App.2d 287 [58 Cal.Rptr. 503]; *Kusmark* v. *Montgomery Ward & Co.* (1967) 249 Cal.App.2d 585 [57 Cal.Rptr. 678]) are not inconsistent with (in fact they recognize) the true rule in *Parsons,* and lend support to our conclusion that the latter case precludes us from disturbing the questioned finding of the trial court, based as it was on conflicting extrinsic evidence and inferences. (See also *Paramount Television Productions, Inc.* v. *Bill Derman Productions* (1968) 258 Cal.App.2d 1, 13 [65 Cal.Rptr. 473]; *Alperson* v. *Mirisch Co.* (1967) 250 Cal.App.2d 84, 95 [58 Cal.Rptr. 178]; *Estate of Fries* (1965) 238 Cal.App.2d 558, 560-561 [47 Cal.Rptr. 888].)

864]; *Sanstrum* v. *Gonser,* 140 Cal.App.2d 732 [295 P.2d 532]; *Edens* v. Stoddard, 126 Cal.App.2d 56, 60 [271 P.2d 610]; *Hooper* v. *Mayfield,* 114 Cal.App.2d 801, 807 [251 P.2d 330]." (59 Cal.2d at p. 576.)

*Franklin* and other cases cited by defendant are distinguishable on their facts, however, from the case at bench. In *Franklin,* the writing upon which the broker placed reliance "fail[ed] to expressly recite *or make reference to* the existence of any employment contract *or to any compensation.*" (59 Cal.2d at p. 573.) (Italics added.) Had there been a reference to employment, an agreement to compensate could have been inferred; conversely, had there been reference to a commission, the broker's authority to act could have been inferred. (*Moore* v. *Borgfeldt* (1929) 96 Cal.App. 306 [273 P. 114]; see discussion, 1 Witkin, Summary of Cal. Law (1969 Supp.) Contracts, § 91, pp. 37-38.)

In *Pac. etc. Dev. Corp.,* the single writing which could have been established as a memorandum stated only "the terms and conditions on which defendant was willing to negotiate for the property," (47 Cal.2d at p. 68) but made no reference to plaintiff-broker's employment by or authority to act for defendant, or to compensation for plaintiff. ■ Analysis of *Morrill* v. *Barneson* and *Kleinsorge & Heilbron* v. *Liness,* also cited in *Franklin,* discloses no more than adherence to the established rule that the mere act of an owner giving a broker a writing which contains the terms upon which the former will sell real property does not amount to employment of the broker or establish his entitlement to recover a commission for making a sale. *Herzog* v. *Blatt* involved an offer to sell within a prescribed time, but without mention or suggestion of employment of plaintiff broker or of a commission. ■ Other cases cited in *Franklin* and additional authorities urged in defendant's appellate brief are equally inapposite to the facts of the case at bench,[9] where the memorandum on its face, by reasonable implication, gives the authority to make a sale.

Here—as we have shown in our somewhat extended chronology of the pertinent facts—Foulks, through his acquaintance with Seck, knew Seck was a real estate agent or broker; the questioned memorandum was written on the back of Seck's business card, which advertised the latter's activity

---

[9]E.g., in *Rosenbaum* v. *Rosenbaum* (1967) 257 Cal.App.2d 193 [64 Cal.Rptr. 632], the court points out that "It is conceded that there was no written memorandum upon which a cause of action could be stated . . . for a real estate commission." (P. 198.) In *Barcelon* v. *Cortese* (1968) 263 Cal.App.2d 517 [69 Cal.Rptr. 657], two brokers brought suit for commission; one recovered and the other was denied recovery because the memorandum upon which he relied to satisfy the statute of frauds expressly *negatived* his authority to act for the principal. (P. 522.)

in real estate; the memorandum impliedly, if not expressly, provided for a broker's commission.[10]

Another line of reasoning reinforces the questioned finding: the issue is not enclosed within the confines of the single memorandum the subject of so much controversy. Surrounding memoranda (the advertising flyers and brochures), in addition to aiding in the clarification of such matters as description of the property and other notations on Seck's business card, were clearly relevant to the subject matter of the calling card memorandum and thus to Seck's employment by and authority to act for Foulks. Foulks admittedly received copies of that literature designating Seck as realtor on the proposed sale as "exclusive agent" for Foulks, and made no objection thereto. (See *Franklin* v. *Hansen, supra,* 59 Cal.2d at p. 574; *Karl* v. *JeBien* (1965) 231 Cal.App.2d 769 [42 Cal.Rptr. 461]; *Spitler* v. *Avery* (1961) 189 Cal.App.2d 811 [11 Cal.Rptr. 724]; *Herring* v. *Fisher* (1952) 110 Cal.App.2d 322, 324 [242 P.2d 963].) In view of Foulks' initials on the calling card memorandum, the fact that none of the advertising material was signed by him or otherwise acknowledged in writing is of no moment. (See *Addiego* v. *Hill* (1968) 268 Cal.App.2d 280, 286-287 [73 Cal.Rptr. 901]; *Karl* v. *JeBien, supra,* 231 Cal.App.2d at p. 772; *Searles* v. *Gonzales* (1923) 191 Cal. 426, 430-433 [216 P.2d 1003, 28 A.L.R. 78]; Annot. 81 A.L.R.2d 991.)

In summary, the finding attacked rests on substantial evidence, and it was entirely appropriate for the trial court to resort to extrinsic evidence in explanation of the full meaning of the pleaded memorandum. ■ "[T]he writing need not be a complete contract, but only a note or memorandum, provided it shows authority to act. When this requirement is met in connection with a definite piece of property, the other terms may be shown by parol. The amount of compensation, and even the agreement to pay a commission, may be so shown. [Citation.]" (*Moore* v. *Borgfeldt, supra,* 96 Cal.App. at p. 311.) ■ And while the essential elements of an agreement may not themselves be supplied by parol, "the usual rules of interpretation are to be applied and the agreement will not be held deficient for the failure to express that which is clearly *implied* when the writing is interpreted in accordance with the intentions of the parties. [Citations.]" (*Hillman* v. *Koch* (1949) 92 Cal.App.2d 163, 168 [206 P.2d 434].) (Italics added.)

---

[10]*Common sense, without resort to dictionary abbreviations, customs of the trade or judicial notice tells us (as it undoubtedly did the trial judge) the meaning of the phrase "6% comm."*

## Plaintiff Seck Did Not Lose the Benefit of the Listing Agreement by Presenting an Offer Which Differed in Its Terms From That Agreement

The court found that at the final meeting in Attorney Sitton's office (called for the purpose of consummating the transaction and execution of the agreement) both Foulks and his attorney, Sitton, "manifested general agreement with the terms and/or conditions of the said seller/buyer contract [the Walker & Donant offer] and verbally accepted the same, except that after the participants, other than SECK and OHM, had left said meeting, the defendant FOULKS, through SITTON,[11] demanded the said plaintiff accept payment of any commission to which he might become entitled, in the event of a consummated sale, in installments, to be paid proportionately as and when said FOULKS was paid the purchase money installments on account of any consummated sale; that said plaintiff did not agree to said condition, as the result of which no sale was ever consummated."

Finding also that the condition imposed by Sitton's demand was reasonable, not arbitrary, and that it was made in good faith, the court further concluded that the listing agreement was no longer in effect when the final Walker & Donant offer was made to Foulks because that offer differed in its terms from those in the listing agreement; it found, therefore, that Seck had not produced a buyer for the property on the terms stated in the listing agreement and that he was not the procuring cause of any sale of the Foulks' property.

In finding that the listing agreement was no longer in effect because the buyer's offer differed in its terms from those in the listing agreement, the court in effect merged the seller-broker agreement into the seller-buyer agreement.

Under settled rules, if a broker produces a buyer on terms set out in his listing agreement, and the seller refuses to perform, the broker may recover his commission on his contract with the seller. On the other hand, if the broker produces a buyer on terms different from those contained in the listing contract, the seller ordinarily has no obligation to the broker. (See, generally, 1 Miller and Starr, Current Law of Cal. Real Estate (1965) p. 205 et seq.)

Where a valid listing contract exists between broker and seller, it is that agreement from which the broker's rights and duties arise. (See *Baumgartner* v. *Meek* (1954) 126 Cal.App.2d 505, 508-509 [272 P.2d 552].)

---

[11]Foulks himself had left the room, along with the other participants.

Unquestionably, however, the rights and obligations of a broker arising from such listing contract may be affected, and must be considered and measured, in part, by the subsequent dealings between the buyer produced by the broker and the seller himself. (*Dale* v. *Raines* (1953) 115 Cal.App. 2d 309, 310-311 [252 P.2d 22].)

With the possible exception of an "exclusive right to sell"[12] listing agreement, a listing contract for the sale of real estate is "an offer of a unilateral contract, the act requested being the procuring by the broker of a purchaser ready, able and willing to buy upon the terms stated in the offer." (*Baumgartner* v. *Meek, supra*, 126 Cal.App.2d at p. 508; see also, *Tetrick* v. *Sloan, supra,* 170 Cal.App.2d at pp. 546-547; 1 Miller and Starr, Current Law of Cal. Real Estate, *supra,* at p. 16.)

Admittedly, in the case at bench, the Walker & Donant offer submitted by plaintiff Seck did not conform to the exact terms of the listing. Among other material differences, the purchase price offered was $565,000 as against an asking price of $620,000; the down payment proposed was $140,000 as against a requested down payment of one-half the asking price. However, as the trial court found, defendant Foulks accepted the Walker & Donant offer in its modified terms.

With respect to the broker's commission, the original listing agreement mentioned only the payment of a 6 percent commission; it contained no provision for the *time* or the *manner* in which that commission was to be paid. Nor was there any discussion between plaintiff and defendant as to the time or manner of payment of the commission until *after* the first Donant & Walker offer was submitted (see fn. 3, *supra*). When defendant at that time suggested that the commission be paid "as the principal payments are made," Seck replied: "No, Mr. Foulks, commission is cash." The matter of commission payment was thereafter discussed by Seck and Foulks several times in passing, and at Foulks' suggestion it was agreed that the manner of payment of the commission would be left to Foulks' accountant.

---

[12]"Generally, there are three types of brokerage listings. First, the general listing. Such is revocable at the will of the owner in good faith at any time before performance, regardless of the efforts expended by the broker. Such a listing leaves the owner free to list his property with other brokers, to sell it himself, or to withdraw it from the market. Second, the exclusive agency. Terms are inserted in the listing which provide that for a stated period the owner will not deal through other brokers, yet he may sell the property himself without liability. Third, the exclusive right to sell. This type of agency even precludes the owner himself from selling the property during the stated term without paying the brokerage commission." (*Tetrick* v. *Sloan* (1959) 170 Cal.App.2d 540, 546 [339 P.2d 613]; see also, Cal. Real Estate Transactions (Cont. Ed.Bar 1967) pp. 136-140.)

The matter was never resolved by the accountant; indeed, there is nothing in the record to show that the question was ever submitted to him.

Thereafter, as we have shown, the final meeting was held at attorney Sitton's office at which, on Sitton's advice, Foulks orally agreed to accept the Walker & Donant offer, despite its variance from the terms set out on the listing agreement. Only then did Sitton request Seck and the co-broker Ohm to accept payment of the brokerage commission on an installment basis. We have shown earlier that although the brokers demurred to the suggestion, they both would have been willing to accede to installment payment of their commission had they known their refusal was to doom the transaction to failure.

■ In asserting his right to a commission, plaintiff acknowledges that a seller may, in his listing agreement with the broker, condition the seller's obligation in practically any manner he chooses. The right of a seller, in this respect, has been clearly recognized:

"The right of a broker to recover a commission *must be measured and limited by the terms of this contract*. The seller and the broker may specifically provide in the commission agreement that no commission shall be earned until the happening of a specified event or contingency, or except on certain defined terms and conditions. Such qualifying language must appear in the commission agreement itself such as the listing, the deposit receipt, the contract of sale, or escrow instructions. *Such a limitation on the broker's commission must be clear and it must specifically indicate the intentions of the parties.* " (Miller and Starr, *supra*, p. 238, citing *Dale* v. *Raines, supra*, 115 Cal.App.2d 309; *Cotton* v. *Jewell Theater Corp.* (1956) 146 Cal.App.2d 243 [303 P.2d 593], and *Shepherd-Teague Co.* v. *Hermann* (1910) 12 Cal.App. 394 [107 P. 622].) (Italics added.)

■ Under the authorities just cited, Foulks had several alternative choices at the final meeting in Sitton's office. He could have rejected Walker & Donant's final proposal outright, and insisted upon adherence to the terms of the original listing with any modifications thereof proposed by him and agreed to by the buyer; he could have insisted—prior to accepting the final Walker & Donant offer—upon modification of his agreement with Seck to permit payment of the broker's commission in installments; or, as he did, he could simply accept the buyer's offer even though it differed in material terms from those contained in the listing agreement and thereafter seek a modification of his separate obligation to the broker. In pursuing the latter alternative, however, Foulks ran the risk of breaching his contract with the broker.

No qualifications or conditions were imposed in the listing bearing upon

the terms or manner of payment of plaintiff's commission. Nor did the later discussions of Seck and Foulks result in any modification of the outright provision for payment of a 6 percent commission.[13] Under the circumstances, therefore, once the broker had produced a ready, willing and able purchaser on terms acceptable to, and accepted by the seller, the broker's rights and the seller's obligations thereupon were governed by the listing agreement interpreted in conformity with Civil Code section 1657 which provides: "If no time is specified for the performance of an act required to be performed, a reasonable time is allowed. If the act is in its nature capable of being done instantly—as, for example, if it consists in the payment of money only—it must be performed immediately upon the thing to be done being exactly ascertained"[14] (See *Lathrop* v. *Gauger* (1954) 127 Cal.App. 2d 754, 765-767 [274 P.2d 730].)

The listing agreement in effect provided that plaintiff would be entitled to a 6 percent commission upon fulfillment of a condition precedent, i.e., the procuring of a buyer, ready, willing and able to purchase defendant's property upon the terms of the listing agreement *or* upon other terms acceptable to the seller. The evidence adduced by plaintiff shows the condition was satisfied, and supports his claim for commission at the moment of Foulks' unqualified acceptance of the revised offer; Foulks could not thereafter demand modification of his agreement with the broker under the listing agreement. (See *Collins* v. *Vickter Manor, Inc.* (1957) 47 Cal.2d 875, 880-881 [306 P.2d 783]; *Martin* v. *Culver Enterprises, Inc.* (1966) 239 Cal.App.2d 925, 928-929 [49 Cal.Rptr. 149]; Cal. Real Estate Sales Transactions, *supra,* pp. 171-172.) Nor does it matter that Foulks' signature to the buy-sell agreement with Walker & Donant was never obtained; Foulks' signature to the buy-sell agreement was not, under the circumstances, a prerequisite to the broker's recovery against the seller under the listing agreement. (See *Stromer* v. *Browning* (1966) 65 Cal.2d 421, 425 [55 Cal.Rptr. 18, 420 P.2d 730].)

 "In this state it is well established, in the absence of any specific agreement to the contrary, that a broker employed to sell real or personal property has earned his commission when, within the life of his contract . . . he has produced a person who is ready, willing, and able to purchase the property on terms satisfactory to the seller, . . . or has produced such

---

[13]Civil Code section 1698 provides: "A contract in writing may be altered by a contract in writing, or by an executed oral agreement, and not otherwise."

[14]The testimony established that where a listing agreement contains no provision to the contrary, custom and usage in the real estate industry call for payment of the broker's commission in cash upon consummation of the broker's services. (See Miller and Starr, *supra,* p. 238 et seq., for suggested provisions to be used for the purpose of negativing such intent or resort to custom.)

a purchaser who has verbally accepted the seller's terms and offered to enter into a written contract embodying the said terms and binding upon both parties. In such cases, the broker's right to commission accrues when the contract of sale is executed, *or* when opportunity to make such contract is given the seller, and the broker becomes entitled to his commission even though the seller is unable or unwilling to complete the sale." (*Twogood* v. *Monnette* (1923) 191 Cal. 103, 107 [215 P. 542].) (Italics added.) It is equally well established that a change in the terms of the listing agreement becomes, "on ratification by the principal, a part of the original contract, and the compensation fixed therein governs, and the broker is entitled to recover in accordance therewith." (*Levy* v. *Wolf* (1905) 2 Cal.App. 491, 494 [84 P. 313]; see also, *Al Herd, Inc.* v. *Isaac* (1969) 271 Cal.App.2d 749, 752 [76 Cal.Rptr. 697, 42 A.L.R.3d 1425]; *Wilson* v. *Roppolo* (1962) 207 Cal.App.2d 276, 281 [24 Cal.Rptr. 437].)

### Attorney Sitton's Demand That the Brokers Accept Their Commission in Installments Was Not an Enforceable Condition to Plaintiff's Right of Recovery

 We have pointed out that during the course of negotiations between buyer and seller, attorney Sitton presented a list of objections, on Foulks' behalf, to the original Walker & Donant proposal. Among eight objections listed by Sitton (and the only one here relevant) was a notation that "Commission payments with respect to the sale should be placed upon an installment basis, to be paid proportionately at such times as seller receives payment on account of purchase price." Following Sitton's and Burke's discussion of the transaction and of the several objections raised by Sitton, Sitton or Burke endorsed opposite the objection we have set out: "Up to agents Seck & Ohm."

Thereafter, as we have noted, the manner and time of payment of the commission was again discussed several times by the principals; Seck agreed at one point to leave the matter to Foulks' accountant, but the issue was never resolved. Only after the parties had finally met, resolved the other objections, and reached an agreement between buyer and seller did Sitton, on Foulks' behalf, demand the brokers' accession to the "condition."

On this record, the trial court found that one of the material conditions of the *listing contract* between Seck and Foulks was that attorney Sitton would have to approve the terms of any *agreement for sale* of the property which might thereafter be offered to Foulks before such agreement for sale would be acceptable to Foulks; that the eight objections listed by Sitton (including objection to the payment of the brokerage commission other than in installments) "were expressed as seller's desires with respect to the sale

of his property," but that such "desires" were in fact "conditions." The court then found that the condition for payment of plaintiff's commission in installments, rather than in a single cash payment "was not arbitrary or unreasonable and was made in good faith by [Foulks]."

Based on these and other findings, the court then found that plaintiff had not procured a buyer who was ready, willing and able to purchase defendant's property "upon the terms and conditions stated in said listing contract, nor was said plaintiff the procuring cause of any sale of said property"—and, in parallel—that "the original seller-broker contract (i.e., the listing agreement) was no longer in effect" at the time of the final meeting of buyer and seller "by virtue of the fact that the offer submitted was not in conformity with [the listing agreement]."

What we have said under the preceding heading is indicative of our view that what defendant seeks (and the trial court in effect permitted) is a merging of the rights and obligations of seller and broker into the buy-sell agreement submitted to and accepted by Foulks as seller. Accepting, as we must, the proposition that Foulks could have insisted upon modification of his listing contract with the broker before accepting the seller's modified offer, he did not here adopt that course. On the contrary, as we have shown, Sitton's *demand* that the broker accept modification of a critical term of the listing agreement was made after Foulks accepted the buyer's offer and at a time when the broker's right to his cash commission, under the listing agreement, had already become fixed.[15] The trial court's finding that Foulks' and Sitton's desire that the commission be accepted in installments was in fact a condition, and a reasonable one, is thus unsupported by substantial evidence.

### EVIDENCE CONCERNING ULTIMATE SALE OF THE PROPERTY; THE ISSUE OF GOOD FAITH

During plaintiff's examination of defendant Foulks under Evidence Code section 776, plaintiff elicited the fact that the subject property was later sold to another purchaser. However, the court sustained, on the ground of immateriality, a defense objection to the question whether a real estate commission had been paid on subsequent sale of the property. Counsel for plaintiff sought to show, on the issue of Foulks' bad faith and arbitrariness, that the later sale was made without payment of a substantial real estate commission.

---

[15]Significantly, the modified buy-sell agreement, executed by Walker & Donant and accepted (but never signed) by Foulks, contains no mention whatever of the real estate commission or the manner proposed for its payment.

The inquiry should have been permitted. Apart from the generality of the objection (see Evid. Code, § 210), Foulks' good faith, or lack thereof in the transaction, was clearly at issue, and the evidence sought to be adduced was relevant and probative in relation to Foulks' conduct during the critical stages of the transaction.[16] As stated in *Stromer* v. *Browning, supra,* 65 Cal.2d 421, at page 424: "A prospective seller . . . owes a duty to the broker not to act arbitrarily or in bad faith to prevent consummation of the transaction where the broker has found a prospective buyer who is ready, able, and willing to purchase the property, and the prospective buyer and the prospective seller have agreed upon the terms and conditions of the sale. [Citations.]" Even had the listing agreement provided for a broker's commission only upon completion of the sale, "[u]nder such circumstances, if a sale is not consummated because the seller, acting arbitrarily or in bad faith, prevented consummation, the broker is entitled to his commission even though his contract provides that payment shall be made out of the proceeds of the sale [citations] or upon successful completion of the escrow [citations]." (*Stromer* v. *Browning, supra,* 65 Cal.2d at pp. 424-425; see Cal. Real Estate Transactions, *supra,* p. 147.)

Under somewhat comparable circumstances, the general policies of law applicable to the situation at bench have been declared as follows: "The purpose of this statute [Civ. Code, § 1624, subd. 5] is to protect the owner of real property, not from every claim of a commission for selling same, but from claims from persons never by him employed or authorized to act. It is equally the policy of the law to protect a broker who has been so employed or authorized, and who, in good faith, has acted." (*Moore* v. *Borgfeldt, supra,* 96 Cal.App. at p. 313.) Here, plaintiff produced evidence adequate in quantity and quality to entitle him to that protection. The findings to the contrary are unsupported by substantial evidence.

The judgment is reversed. The case is remanded for further proceedings in accordance with the views expressed herein, and with the same effect as though the motion under Code of Civil Procedure section 631.8 had been denied.

Friedman, Acting P. J., and Regan, J., concurred.

A petition for a rehearing was denied June 8, 1972.

---

[16]It will be recalled, of course, that defendant's case has not been presented; we have before us only plaintiff's evidence, and the testimony of Foulks under Evidence Code section 776 as to the circumstances surrounding formulation of the listing agreement.