[Civ. No. 24267.    First Dist., Div. Two.    June 26, 1968.]

THEODORE M. BARCELON, Plaintiff, Cross-defendant and Appellant, v. ROSS W. CORTESE et al., Defendants, Cross-defendants and Appellants; E. S. MERRIMAN & SONS, Defendant, Cross-complainant and Respondent.

(Consolidated Appeals.)

Stark & Champlin, John F. Wells and David M. Lightner for Plaintiff, Cross-defendant and Appellant.

Miller, Groezinger, Pettit, Evers & Martin and Harold C. Nachtrieb for Defendants, Cross-defendants and Appellants.

Pillsbury, Madison & Sutro, Noble K. Gregory, Harlan M. Richter and Walter R. Allan for Defendant, Cross-complainant and Respondent.

TAYLOR, J.—These consolidated appeals involve the actions of two licensed real estate brokers, plaintiff, Theodore M. Barcelon, and E. S. Merriman & Sons, a corporation, to recover commissions on alleged agreements for their respective services to the buyer, defendant, Ross W. Cortese, president and agent of defendant, Rossmoor Corporation.

Barcelon and Merriman stipulated that each would be entitled to 50 percent of any judgment recovered by the other and the actions were consolidated for trial. Barcelon appeals from the judgment of nonsuit against him and in favor of Cortese and Rossmoor, contending that: 1) there was a written memorandum sufficient to satisfy the statute of frauds (Civ. Code, § 1624, subd. 5), as to his employment by Cortese; 2) there was sufficient evidence of Cortese's contractual obligations to permit the matter of the commission to go to the jury; 3) the court erred in excluding certain evidence showing the fact of Barcelon's employment by Cortese, and abused its discretion in not allowing an amendment to conform to the proof as to a contract between Cortese and Merriman for his benefit. Cortese and Rossmoor appeal from the judgment rendered on the jury verdict in favor of Merriman and from the order denying their motion for a judgment notwithstanding the verdict, contending that: 1) there was no written memorandum sufficient to satisfy the statute to show an employment relationship between them and Merriman; 2) the evidence does not support the verdict, as Merriman was to look to the seller for the commission.

## THE FACTS

A chronology of the pertinent facts is necessary for an understanding of the issues presented on each appeal. While on a business trip to Los Alamitos in 1957, Barcelon approached Cortese about the possibility of building a subdivision in the San Francisco Bay Area. The parties orally agreed that Barcelon would furnish to Cortese information regarding any parcels of land in which Cortese might be interested, that Barcelon would receive no expenses and that compensation would consist solely of the normal sales commission on any such property which Cortese bought.

Accordingly, Barcelon engaged in a variety of activities on Cortese's behalf in locating, investigating and negotiating for the acquisition of unimproved parcels of land suitable for subdivision development in the San Francisco Bay Area. By a letter dated December 26, 1958, Barcelon first brought to the attention of Cortese the property that is the subject of this action, a 2,000-acre parcel in the Walnut Creek area owned by the Dollar family. Barcelon's letter, without specifically identifying the Dollar Ranch, indicated that the property was available for about $4,000,000, with a cash downpayment of $1,000,000. Cortese indicated his interest by a reply dated January 6, 1959. Thereafter, Barcelon met with a Mr. Meek, a representative of the Dollars, and Mr. Draeger, an. engineer who had previously made an engineering study of the property. On January 15, 1959, Barcelon transmitted to Cortese a comprehensive report on the Dollar Ranch, including a map of the area, an aerial photograph of the property and explanations concerning topography, utilities, proximity to shopping centers, water, sewers and drainage.

On January 26, 1959, Cortese telephoned Barcelon and inquired about the possibility of obtaining an option on the Dollar Ranch. On February 24, 1959, after consulting with Meek, Barcelon transmitted to Cortese a suggested form of option agreement. Thereafter, Cortese apparently lost interest in the Dollar Ranch. However, for the next two years, Barcelon continued his activities on behalf of Cortese in other areas, principally Sacramento.

In January 1961, Merriman made its first contact with Cortese when Merriman's then-president, Dwight Merriman, and Joseph Parker, then the manager of Merriman's appraisal department, met Cortese in Los Angeles in the course of other business dealings. At this meeting, Cortese indicated that he was interested in acquiring one or more sites for retirement

centers in the San Francisco Bay Area and inquired whether Merriman was equipped to locate and present to him such sites for his review and possible purchase. At this time and thereafter, Merriman had an ''open listing'' on the Dollar Ranch. This meant that the broker who first produced a buyer willing to pay the Dollars' asking price, would receive the customary commission.

In late February 1961, Cortese telephoned Parker and asked him to work along the lines discussed at their Los Angeles meeting. In March and April 1961, Merriman, acting primarily through Parker, located and investigated six or seven parcels of land which were presented to Cortese for his consideration. These included the Dollar Ranch.

Cortese expressed an immediate interest in the Dollar Ranch, and the parties orally agreed that Merriman would commence negotiations with the Dollars but at the same time explore in greater depth some of the alternate sites in the Bay Area that had been discussed. They also agreed orally that Merriman would share with Barcelon any commission payable in connection with the purchase of the Dollar Ranch. Merriman agreed to this arrangement on condition that Merriman would be the authority in the negotiations. Cortese indicated that Merriman would be the supervising broker and told them that Barcelon would contact them.

On May 6, 1961, Cortese came to Barcelon's office stating that he had started out this thing with Barcelon and wanted to continue to do so. Cortese indicated to Barcelon that he wished to purchase the Dollar Ranch through him and asked him to obtain the reactions of government officials to the proposed retirement center and to gather population estimates. Barcelon met with Mr. Gould, a representative of the Dollars, as well as various government officials, and sent to Cortese several letters concerning these matters, as well as the terms of a possible offer for the Dollar Ranch.

On May 11, 1961, Cortese telephoned Barcelon to ask if Parker had called. He suggested that Barcelon work with Parker and indicated that there was enough money involved in the transaction in terms of commission to support two brokers. On May 15, 1961, Cortese wrote to Barcelon giving him Parker's telephone number and stating: ''I believe Mr. Parker is out of town this week, but you can contact him the first of next week and he will work with you on the Dollar property.'' By letter dated May 24, 1961, Barcelon informed Cortese that he had met with Parker and provided substan-

tial information on the terms of a possible offer on the Dollar Ranch. This letter stated: "The commission is 6% of the first $1,000,000 and 2½% of the balance (Seller will pay.)"

Cortese's reply dated June 1, 1961, indicated dissatisfaction with Barcelon's approach to the Dollar Ranch transaction and stated, in pertinent part, as follows: "In reference to the Dollar Ranch—it may be one of the ranches that we may consider purchasing. I came into your office as a matter of good ethics, as you only wrote to me—you never showed me the Dollar Ranch previously, but I do feel that if we purchase the Dollar Ranch it will be through Mr. Joe Parker. He will represent us solely and exclusively in the San Francisco area on land purchases.

"As a matter of information to you, I feel that your approach by immediately submitting a purchase agreement to us, as you did, is wholly in error. I feel that Mr. Parker's experience and the people they know in the San Francisco area will be a big help to you as well as to us. Mr. Parker will be more than fair with you as far as the commissions are concerned. . . .

"Your approach to the acquisition of the Dollar Ranch is extremely poor and this is the reason that any future property that I may have in mind in the San Francisco area will be made through Mr. Parker, and he will keep you advised if the deal is consummated and will be glad to cooperate with you on the commission."

Thereafter, on June 26, 1961, Cortese wrote to Barcelon that after surveying the Dollar Ranch with his lender, he had decided to drop the purchase of the property because the weather was too hot for a retirement center. On July 5, 1961, Barcelon sent Cortese a weather chart showing that the average temperatures in the vicinity of the Dollar Ranch were no hotter than in certain other areas where retirement centers were located. This was Barcelon's last contact with Cortese until the fall of 1962, when Barcelon learned that Cortese had purchased the Dollar Ranch directly from the owners. On learning this, Barcelon made demands on both Cortese and the Dollars for the payment of his earned commission and filed this action after both Cortese and the Dollars rejected his claims.

In the meantime, during June 1961, Merriman, through Parker, continued to work on the Dollar Ranch transaction on behalf of Cortese. Although the initial fee arrangement between Cortese and Merriman was on a straight time basis,

by June 1961, the parties agreed that if a deal were made, Merriman would receive the usual broker's commission. This agreement was reaffirmed in May 1962, with specific reference to the pending Dollar Ranch transaction, wherein Merriman was to represent Cortese in the role of broker negotiating with the Dollars and to act solely on behalf of Cortese.

After June 1961, Cortese again lost interest in the Dollar Ranch because of the hot climate and the negotiations remained dormant. Merriman, however, continued to investigate other suitable properties for Cortese, including a parcel owned by Stanford University. In May 1962, Cortese again contacted Merriman and indicated a renewed interest in the Dollar Ranch. As Parker was at this time leaving Merriman, the negotiations were taken over by Albert Cummings, a vice-president of Merriman. At a meeting on May 5, 1962, between Cortese, Parker, Cummings and Cortese's attorney in San Francisco, Cortese categorically stated he wished to purchase the Dollar Ranch. After the parties expressly agreed that Merriman would represent Cortese rather than the Dollars in the transaction, Cummings resumed negotiations for the purchase of the Dollar Ranch by Cortese. Cummings arranged several meetings between Cortese and the representatives of the Dollars. At a meeting on May 5, 1962, Gould, a representative of the Dollars, stated that all of the parties would have to recognize that if a sale were made and a commission paid, Barcelon would certainly have to be taken care of in the transaction.

On May 25, 1962, Cummings, Cortese and Cortese's attorney drew up a written offer for the Dollar Ranch based on a gross selling price of $4,500,000, including the commission, and providing that the seller would pay the commission. *The purpose of including the commission in the selling price was to facilitate Cortese's financing of the total amount.* On May 28, 1962, the offer, along with Cortese's check for $100,000 was transmitted by Cummings to the Dollars. The letter of transmittal from Cummings to the Dollars stated: "You will note the offer contemplates that you will pay any real estate commission incident to the sale if the offer is accepted, and we of course deem ourselves to be your broker in connection with this offer and will expect the commission to be payable to us."

After a period of discussions and delay occasioned by the absence abroad of Mr. Hickingbotham, the Dollars' chief

negotiator, the Dollars refused the offer as they wanted a net cash price of $4,650,000 (meaning that the commission was not included in the net price). Thereafter, Cortese indicated to Cummings that he wished to continue the negotiations. Cummings continued his activities on behalf of Cortese and discussed with Cortese the terms of a renewed offer.

In the latter part of July 1962, Cortese telephoned Parker, who was then working in a different business, to discuss bringing another representative into the Dollar Ranch negotiations on his behalf as he had become disenchanted with Merriman. When Parker indicated he could not re-enter the negotiations, Cortese suggested Russell Wolden, then the Assessor of the City and County of San Francisco. Parker advised Cortese against Wolden's participation and they then discussed bringing into the negotiations Joseph Martin, a prominent San Francisco attorney. On July 6, 1962, Cortese's attorneys informed Merriman that Martin had been associated in the matter and would be in touch with them. Merriman acknowledged this letter by a reply dated July 11, 1962, and thereafter had nothing further to do with the transaction.

On August 6, 1962, a meeting was held between the representatives of the Dollars and Cortese. Neither Barcelon nor Merriman was invited to this meeting. On September 11, 1962, Cortese and the Dollars entered into an option agreement for Cortese's purchase of the Dollar Ranch for $4,835,000. On October 30, 1962, Cummings wrote a letter to the Dollars stating that if the property was sold to Cortese, Merriman expected the Dollars to pay the commission in accordance with the original discussions of the transaction. On May 10, 1963, Cortese exercised his option to buy the ranch, and thereby directly purchased it from the Dollars. No commission was ever paid. The customary amount of the commission on the sale would have been $124,375.

In March 1964, Barcelon filed his complaint against Cortese in this matter and Merriman cross-complained. After the two actions were consolidated for trial, Barcelon and Merriman stipulated that they would split any judgment recovered by them. At the close of plaintiff's case, the trial court granted Cortese's motion for a nonsuit as to Barcelon on grounds of insufficient written evidence of the employment relationship between them to satisfy the statute of frauds (Civ. Code, § 1624, subd. 5), and subsequently the jury returned a verdict in favor of Merriman.

## I. Barcelon's Appeal From the Judgment of Nonsuit

██ Barcelon contends that the correspondence between him and Cortese constitutes a memorandum sufficient to satisfy the statute of frauds (Civ. Code, § 1624, subd. 5), as well as sufficient evidence of Cortese's breach of contract to permit the jury to decide the matter of the commission; that, therefore, the trial court abused its discretion in excluding most of his correspondence with Cortese and the documents relating to his work for Cortese; and that the trial court abused its discretion in not allowing an amendment to conform to proof as to the contract between Cortese and Merriman for his benefit.

The statute of frauds, section 1624 of the Civil Code, provides that an agreement authorizing or employing an agent or broker to purchase or sell real estate for compensation or commission is invalid "unless the same, or some note or memorandum thereof, is in writing and subscribed by the party to be charged or by his agent."

██ Barcelon, as a licensed broker, was presumed to know that contracts for the employment of real estate brokers are invalid and unenforceable unless put in writing and subscribed by the person to be charged (*Pacific etc. Dev. Corp.* v. *Western Pac. R. R. Co.*, 47 Cal.2d 62 [301 P.2d 825]; *Franklin* v. *Hansen*, 59 Cal.2d 570 [30 Cal.Rptr. 530, 381 P.2d 386]).

██ A memorandum is deemed sufficient if it shows the employment relationship between the parties and neither the amount of the commission nor a specific promise to pay the same need be expressed in the memorandum (*Beazell* v. *Schrader*, 59 Cal.2d 577, 580 [30 Cal.Rptr. 534, 381 P.2d 390]). The authorities require that the fact of employment (i.e., the broker's authority to act or negotiate for the principal), be unequivocally stated (*Pacific etc. Dev. Corp.* v. *Western Pac. R. R. Co.*, *supra*, p. 69) and that the broker to whom the commission is to be paid, be named (*Rosenbaum* v. *Rosenbaum*, 257 Cal.App.2d 193, 198 [64 Cal.Rptr. 632]).

██ Cortese's letter of June 1, 1961, to Barcelon is the evidence upon which Barcelon must primarily rely in attempting to establish a sufficient memorandum. The letter, quoted in the statement of facts above, indicated Cortese's dissatisfaction with Barcelon's approach to the Dollar Ranch transaction and unequivocally stated that in the future, Parker (then Merriman's employee) would be Cortese's sole and exclusive agent for land purchases in the San Francisco Bay Area. For his contention that the letter is a sufficient memor-

andum, Barcelon points to the portions stating: ''Mr. Parker will be more than fair with you as far as the commissions are concerned,'' and ''Mr. Parker . . . will keep you advised if the deal is consummated and will be glad to cooperate with you on the commission.'' Barcelon argues that this language, when read in the context of Cortese's additional written and oral instructions to him to get in touch with Parker and work with him, is a sufficient indication of the fact of his authority to act for Cortese in the Dollar Ranch matter.

We note that Barcelon's uncontroverted testimony indicated that his initial arrangements made orally with Cortese in Los Alamitos in 1957 were that he was not to be compensated for any work for Cortese and would look only to the commission resulting from any consummated sale (presumably to be paid by the seller). Thus, any written memorandum relied on by Barcelon would have to clearly indicate a change in this arrangement.

Cortese's letter of June 1, 1961, as well as his subsequent letter of June 26, 1961, to Barcelon (negating his interest in the Dollar Ranch because of the climate), clearly and unequivocally revokes any authority he may previously have orally granted to Barcelon to act on behalf of or negotiate for Cortese and, with the same clarity, unequivocally indicates that Parker is to have the sole and exclusive authority to act on behalf of Cortese. It is this express revocation of authority, coupled with the reference to the splitting of the commission, that makes the instant case one of unusual interest. As indicated above, the crucial fact, which must be in writing, is the broker's authority to act for the principal; once this is established, the exact terms of the sale or amount of the commission need not be included in the memorandum. However, even a clear statement as to the amount and terms of the commission without any indication of the broker's authority will not suffice (*Beazell* v. *Schrader, supra*). The written memos here contain a negation of the crucial fact of any authority to act, together with an implication that Barcelon was to share with Merriman in the commission.

■ The next question is whether, for purposes of the statute of frauds, the fact of Barcelon's co-employment with Parker can be inferred from the reference to the commission alone. Although the precise question in relation to the buyer's written obligation to pay the commission has not been decided, it is well settled that a statement by the seller that he will pay the regular commission as part of the condition of

the sale does not make the writing sufficient to satisfy the statute (*Morrill* v. *Barneson*, 30 Cal.App.2d 598 [86 P.2d 924]). In *Morrill*, the letter to the broker from his principal, the seller, described the property and his terms and stated: "The regular 5% commission will be paid." The court held, at pages 600 and 601, that since the letter contained no other terms of employment, the language referring to the commission was nothing more than additional information concerning the sale. In so holding, the court relied on a number of authorities where the principal's willingness to sell was made sufficiently clear by the writing but there was *no express language* authorizing the particular broker to sell or negotiate the sale of the property. *Hooper* v. *Mayfield*, 114 Cal.App.2d 802 [251 P.2d 330], is to the same effect. In *Hooper*, the seller's written offer to the broker stated, at pages 804-805: " 'Bidder shall state in dollars the amount of real estate commission, if any, *that is to be deducted from the purchase price*. The rate of such commission shall not be in excess of that customary in the sale of farm property in San Joaquin County.' " ▮▮▮ The memo was held insufficient for purposes of the statute. If it was the intent of the parties that Barcelon was to act as Cortese's intermediary in the Dollar Ranch negotiations, along with Merriman, who was the exclusive and supervising broker, Barcelon, as a licensed broker, was presumed to know that contracts for real estate commissions are invalid and unenforceable unless the fact of the employment is put in writing and subscribed by the person to be charged, and he should have secured a proper written authorization to protect himself and his unusual role in the transaction (*Rosenbaum* v. *Rosenbaum*, *supra*, pp. 198-199). We hold that in view of Barcelon's failure to meet the strict requirement of the statute, the trial court properly concluded that the June 1, 1961 letter was not a sufficient memorandum of Barcelon's authority to act for Cortese. Accordingly, there was no error in the exclusion of the other documents relating to the work done by Barcelon for Cortese and the correspondence relating thereto,[1] and the court properly granted the nonsuit as to Barcelon.

▮▮▮ We turn next to Barcelon's contention that the trial

---

[1] We note that the trial court was particularly careful and thorough in the trial of these closely interrelated matters and initially admitted all of the evidence subject to objections, and finally excluded it only when it became apparent that Barcelon had not met his burden as to the statute of frauds.

court abused its discretion in not allowing him to amend his pleadings to conform to the proof of a third party beneficiary contract entered into by Cortese and Merriman for his benefit. This contention likewise is based on the letter of June 1, 1961. The record indicates that this theory of the case was first suggested by the trial court after the extensive discussion in chambers on the nonsuit. The following day, Barcelon moved to amend his complaint to include this theory and the trial court denied the motion as it was beyond the issues set forth in the pretrial order. The pretrial order indicates that Barcelon's complaint was based on Cortese's alleged breach of contract and only issues relating thereto were contemplated by the pretrial order.

A motion to amend pleadings to conform to proof rests in the sound discretion of the trial judge and his exercise thereof will not be disturbed on appeal unless it clearly appears that there has been an abuse of discretion. As here the contemplated amendment introduced a new issue and could have substantially changed the defense of Cortese,[2] we conclude that there was no abuse of discretion (*Brautigam* v. *Brooks,* 227 Cal.App.2d 547 [38 Cal.Rptr. 784]).[3]

## II. Cortese's Appeal From the Judgment on the Jury Verdict in Favor of Merriman

On this appeal, Cortese and Rossmoor contend that: 1) there is no sufficient written memorandum of an employment relationship between him and Merriman; and 2) the evidence does not support the judgment as there was no evidence of any agreement to pay a real estate commission to Merriman in addition to the purchase price, and there was evidence that Merriman expected the Dollars to pay the commission.

As to the first issue, the identical principles discussed above are applicable, as an agreement authorizing a broker to obtain an option to purchase real property is within the statute of frauds (*Pacific etc. Dev. Corp.* v. *Western Pac. R. R.*

---

[2]To recover, Barcelon would have to prove that the agreement between Cortese and Merriman was made expressly for his benefit (*Mottashed* v. *Central & Pac. Improv. Corp.,* 8 Cal.App.2d 256 [47 P.2d 525]; Civ. Code, § 1559), a questionable proposition under the circumstances.

[3]We also note that the trial court's ruling may have been correct on the merits, as it has been held that the mention of the broker's commission (payable to the vendor's broker) in the purchaser's escrow instructions did not obligate the purchaser to pay the commission (*Steinberg* v. *Buchman,* 73 Cal.App.2d 605 [167 P.2d 207]). The court noted that the vendor's direction to the escrow holder for the payment of the commission was expressly for the benefit of the plaintiff-broker, but was in no sense a contract to which the defendant-purchaser was a party.

*Co., supra*). As to Merriman, Cortese's letter of June 1, 1961, to Barcelon establishes the crucial fact of Merriman's authority to act (through Parker) as Cortese's sole and exclusive agent for the purchase of property in the San Francisco Bay Area. There are also ample indications of Cortese's employment of Merriman, such as Cortese's letter of August 23, 1961, wishing Parker a lot of luck in securing the Stanford property that Merriman was investigating on his behalf at that time.

Cortese's argument that Merriman is not entitled to a commission unless there is written evidence of an agreement to pay a commission is entirely without merit. In *Pacific etc. Dev. Corp.* v. *Western Pac. R. R. Co., supra,* the very authority on which Cortese relies, the broker did not prevail as the writing in question made no reference to any employment relationship or his authority to act for the principal. Similarly, in *Franklin* v. *Hansen, supra,* the court noted that the writing relied upon by the broker was silent as to the existence of the employment relationship. However, in both cases, the court expressly stated that there is no requirement that there be a reference to compensation when, as here, a writing recognizes an employment relationship. As stated in *Moore* v. *Borgfeldt,* 96 Cal.App. 306 [273 P. 1114] (cited with approval in *Beazell* v. *Schrader, supra*), "the writing need not be a complete contract, but only a note or memorandum, provided it shows authority to act. When this requirement is met in connection with a definite piece of property, the other terms may be shown by parol. The amount of compensation, and even the agreement to pay a commission, may be so shown" (p. 311). The various letters introduced in the instant case expressly recognize the employment of Merriman to act for Cortese in the Dollar Ranch transaction, and are plainly sufficient to satisfy the requirement of the statute of frauds.

Cortese next contends that the verdict is not supported by the evidence as there was unequivocal written evidence indicating that Merriman looked to the Dollars for the payment of the commission. This contention is based on Merriman's letters so stating to the Dollars. The first of these, dated May 28, 1962, was Merriman's letter of transmittal with Cortese's original offer and check, which were subsequently rejected; the second was written by Merriman on October 30, 1962, after the signing of the Cortese and Dollar option agreement. Cummings explained the first letter by not-

530

ing that under Cortese's initial offer, the commission was to be included in the money placed in escrow in order to enable Cortese to finance the entire amount that he was obligated to pay. Cummings further explained that he wrote the October 30, 1962 letter on the assumption that Cortese had authorized and directed the Dollars to pay the commission from the total amount paid to them.

Under the circumstances of this case, Cortese's letter of June 1, and Merriman's letters of May 28 and October 30, the issue of whether Merriman looked to Cortese or the Dollars for its commission, was one of fact for the jury. The jury was properly instructed that Merriman had the burden of proving that it looked to Cortese for the payment of the commission rather than to the Dollars. As in *Caminetti* v. *National Guar. Life Co.*, 56 Cal.App.2d 92 [132 P.2d 318], the question was submitted to the trier of fact and resolved. The summary of the facts indicates the sufficiency of the evidence to sustain the verdict. Accordingly, it is not necessary to discuss Cortese's contention that his motion for a judgment notwithstanding the verdict should have been granted. Nor do we need to discuss Cortese's contention concerning the two-year delay between his acquisition of the Dollar Ranch in 1962 and the filing of Merriman's cross-complaint in 1964. The statute of limitations for written contracts is four years (Code Civ. Proc., § 337). We conclude that there is no merit in any of Cortese's contentions relating to the judgment rendered on the jury verdict in favor of Merriman, which must be affirmed.

The judgment of nonsuit in favor of Cortese and Rossmoor is affirmed. The judgments in favor of Merriman on its cross-complaint against Cortese and Rossmoor and the order denying the judgment notwithstanding the verdict, etc. are affirmed. Merriman to recover its costs on appeal from Cortese and Rossmoor. All other parties to bear their own costs.

Shoemaker, P. J., and Agee, J., concurred.

A petition for a rehearing was denied July 26, 1968 and the petition of defendants, cross-defendants and appellants for a hearing by the Supreme Court was denied August 21, 1968.