Filed 12/1/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| WESTSIDE ESTATE AGENCY, INC. | B268455 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC577588) |
| v. | |
| JAMES RANDALL et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Elizabeth R. Feffer, Judge.  Affirmed.

Freedman + Taitelman, Michael A. Taitelman and Bradley H. Kreshek for Plaintiff and Appellant.

Alston & Bird, James R. Evans, Jr. and Cassandra E. Hooks for Defendants and Respondents.

\* \* \* \* \* \*

We are all familiar with the phrase, "caveat emptor":  Buyer beware.  This case deals with its less renowned cousin, "caveat sectorem":  *Broker beware*.  California's statute of frauds declares invalid any "agreement authorizing or employing an agent, broker, or any other person to purchase or sell real estate" unless that agreement is in writing and signed by the broker's client.  (Civ. Code, § 1624, subd. (a)(4).)[1]  This is a nearly absolute rule, with only a few very narrow exceptions.  The broker in this case missed out on a $925,000 commission because he agreed to help a friend buy a $45 million Bel Air estate, but the deal was ultimately closed by another broker on different terms.  Critically, the first broker's agreement was not in writing.  The first broker sued his friend/client for the commission, and the trial court dismissed the lawsuit for noncompliance with the statute of frauds.  After examining in detail the statute of frauds and its exceptions, we conclude the trial court was right and affirm.

## FACTS AND PROCEDURAL BACKGROUND

### I.  Facts

We draw the facts set forth below from the allegations in the operative, first amended complaint (FAC), which we assume to be true for purposes of evaluating the demurrer on appeal before us now.  (*Coker v. JPMorgan Chase Bank, N.A.* (2016) 62 Cal.4th 667, 671.)

In early 2014, defendants James and Eleanor Randall (the Randalls) told their long-time friend and business acquaintance Stephen Shapiro (Shapiro) that they were looking to buy a home in Los Angeles.  Shapiro was a licensed real estate broker and the principal of plaintiff Westside Estate Agency, Inc. (Westside).  Shapiro agreed to represent them, but their agreement was never put in writing.

In October 2014, Shapiro identified a potential property for the Randalls to buy—namely, a $65 million estate in the Bel Air neighborhood of Los Angeles.  The listing for the property included an offer by the seller's broker "to pay" "to the buyer's broker" "a cooperating broker's fee" of 2 percent of the sale price.  The Randalls asked Shapiro to apply any broker's

---

[1]  All further statutory references are to the Civil Code unless otherwise indicated.

2

fee Westside would receive and let them use it toward the purchase price; Shapiro refused. On October 24, 2014, Shapiro nevertheless made a $42 million offer on the property on behalf of the Randalls. Over the next month, Shapiro and the seller volleyed offers and counteroffers back and forth. On November 24, 2014, Shapiro presented a new written offer to buy the estate for $45 million. The seller indicated that it was "agreeable" to the offer, but only if the Randalls agreed to (1) an "as is" clause, and (2) a transfer of warranty clause. The Randalls reached out to their attorney, Richard Meaglia (Meaglia), for his advice. In the meantime, Shapiro "worked with [the] Seller's Broker through the night to finalize the terms of" an agreement. However, the following day, James Randall e-mailed Shapiro and instructed him to "cancel [the] offer" because they were "turned off on [the property]."[2]

Three months later, in February 2015, the Randalls made a $47 million offer on the property with Meaglia acting as their broker. Escrow closed a month later for a final purchase price of $46.25 million, $1.25 million *more* than the Randalls' final November 2014 offer. Meaglia applied the $925,000 cooperating broker's fee against the purchase price.

## II. Procedural History

In April 2015, Westside sued the Randalls and Meaglia (collectively, defendants). In the FAC, Westside sued the Randalls for breach of an implied contract and sued Meaglia for intentional interference with an implied contract.[3] Westside prayed for compensatory damages of $925,000, the same amount as the broker's fee Meaglia eventually collected.

Defendants demurred to the FAC.

---

[2]     During oral argument, Shapiro argued that the Randalls agreed to the terms of the agreement he had negotiated overnight, but the FAC's allegations are—as noted in the text—to the contrary.

[3]     In its initial complaint, Westside also sued Meaglia for intentional interference with a prospective economic advantage and sued Meaglia and the Randalls for violating the unfair competition law (Bus. & Prof. Code, § 17200 et seq.). All three defendants filed a demurrer and a motion to strike. Before either motion was heard, Westside filed the FAC.

3

The trial court sustained the demurrer as to both counts, without leave to amend as to the Randalls and with leave to amend as to Meaglia. The court reasoned that Westside was trying to collect a broker's commission from the Randalls without any written agreement evidencing the broker-client relationship, that this claim fell "squarely within" the statute of frauds, fell outside any of the exceptions to the statute, and that any unwritten agreement was consequently unenforceable as a matter of law. Given the absence of any enforceable contract, the court went on to rule, Meaglia could not have interfered with a valid contract; however, the court opined that Westside "may . . . be able to amend to assert a viable tort cause of action" against Meaglia.

Westside subsequently dismissed its case against Meaglia, and the trial court entered a final judgment dismissing the FAC against all defendants.

Westside filed this timely appeal.

## DISCUSSION

Westside challenges the trial court's dismissal of its breach-of-implied-contract claim and its denial of leave to amend. In assessing whether a demurrer was properly sustained, we independently ask "'whether the [operative] complaint states facts sufficient to constitute a cause of action.'" (*Loeffler v. Target Corp.* (2014) 58 Cal.4th 1081, 1100, quoting *City of Dinuba v. County of Tulare* (2007) 41 Cal.4th 859, 865; see also *Lee v. Hanley* (2015) 61 Cal.4th 1225, 1230 [de novo review].) In answering this question, we "'assume the truth of the complaint's properly pleaded or implied factual allegations.'" (*Loeffler*, at p. 1100, quoting *Schifando v. City of Los Angeles* (2003) 31 Cal.4th 1074, 1081.) A demurrer may be sustained when an alleged contract falls "within the statute of frauds and does not comply with its requirements." (*Parker v. Solomon* (1959) 171 Cal.App.2d 125, 136; *Deeter v. Angus* (1986) 179 Cal.App.3d 241, 247-248.) In assessing whether leave to amend was properly denied, we review for an abuse of discretion by asking "'whether there is a reasonable possibility that the defect can be cured by amendment.'" (*Loeffler*, at p. 1100.)

## I. Sustaining the Demurrer

The statute of frauds declares several types of agreements "invalid" unless "they, or some note or memorandum thereof, are in writing and

4

subscribed by the party to be charged or by the party's agent." (§ 1624, subd. (a).) As pertinent to this case, the statute applies to "[a]n agreement authorizing or employing an agent, broker, or any other person to purchase or sell real estate, . . . or to procure, introduce, or find a purchaser or seller of real estate . . . , for compensation or a commission." (*Id.*, subd. (a)(4).) A court applying the statute of frauds is accordingly presented with two questions: (1) does the statute apply to the contract at issue?; and if so, (2) are the statute's requirements of a properly subscribed writing met?

### A. *Does the statute of frauds apply?*

The portion of the statute of frauds applicable here can apply to licensed brokers and anyone else who aids and assists them or who otherwise engages in acts covered by the statute. (§ 1624, subd. (a)(4) [reaching "any other person"]; *Duckworth v. Schumacher* (1933) 135 Cal.App. 661, 666 [reaching those who "aid and assist in the purchase or sale"]; *Marks v. Walter G. McCarty Corp.* (1949) 33 Cal.2d 814, 819-820 (*Marks*) [noting how statute reaches persons who are not licensed brokers].) However, the statute only reaches agreements for "compensation or a commission" owing to the "purchase or [sale of] real estate, . . . or . . . procur[ing], introduc[ing], or find[ing] a purchaser or seller of real estate." (§ 1624, subd. (a)(4).) It does not reach contracts employing persons, even brokers, merely to provide information about real estate or to search for suitable locations to purchase, except when those functions are "incidental" to one of the purposes otherwise covered by the statute of frauds. (*Owen v. National Container Corp.* (1952) 115 Cal.App.2d 21, 25-26 (*Owen*) [statute of frauds does not apply to agreements for conducting surveys, furnishing plans or "merely giv[ing] . . . information as to available factory sites"]; see generally *Phillippe v. Shapell Industries* (1987) 43 Cal.3d 1247, 1256 (*Phillippe*) [other services that are "incidental to [a broker's] efforts to bring about a sale of . . . property" are covered by the statute of frauds]; see generally *id.* at p. 1255 ["[a] licensed broker may be able under appropriate circumstances to recover under an oral agreement or in quantum meruit for certain services other than the purchase, sale, or leasing of property"].)

Once the statute of frauds applies, its bar against relief is absolute and applies no matter how the unhappy broker styles his or her claim to recover

5

compensation or a commission. (*Phillippe*, *supra*, 43 Cal.3d at pp. 1263-1264 [generally no recovery on a theory of quantum meruit, unjust enrichment or equitable estoppel]; *Beazell v. Schrader* (1963) 59 Cal.2d 577, 582 (*Beazell*) [same, as to quantum meruit].) Were the bar not absolute, the bar would be easily evaded, and the "primary purpose" for making such contracts subject to the statute of frauds—to serve as a "consumer protection" mechanism "to protect real estate sellers and purchasers from the assertion of false claims by brokers for commissions"—would go unserved. (*Phillippe*, at pp. 1257, 1266; *Estate of Stephens* (2002) 28 Cal.4th 665, 679 (dis. opn. of Kennard, J.) ["the statute of frauds avoids the likelihood that permitting oral proof of such transactions would encourage fraudulent claims by swindlers gambling that they can glibly persuade a jury to enforce a nonexistent oral agreement"]; see generally *Estate of Duke* (2015) 61 Cal.4th 871, 889.)

However, not all actions involving brokers are barred by the statute of frauds. Some actions are not subject to the statute in the first place. These include: (1) an action to recover for a broker's performance of services *other than and not incidental to* the sale or purchase of real estate or procuring, introducing or finding a purchaser or seller of real estate, as noted above (see *ante*, at p. 5; cf. § 1624, subd. (a)(4)); (2) an action by a principal against his or her broker to disgorge a commission already paid on the ground that the broker breached its fiduciary duty and obtained a secret profit (*Steiner v. Rowley* (1950) 35 Cal.2d 713, 717; *Gann v. Williams Brothers Realty, Inc.* (1991) 231 Cal.App.3d 1698, 1705-1706); and (3) an action between brokers to divide a jointly earned commission (e.g., *Goossen v. Adair* (1960) 185 Cal.App.2d 810, 819 (*Goossen*); *Holland v. Morgan & Peacock Properties Co.* (1959) 168 Cal.App.2d 206, 210; *Dornberg v. Frank Meline Co.* (1932) 121 Cal.App. 630, 632; *Jenkins v. Locke-Paddon Co.* (1916) 30 Cal.App. 52, 57).

The courts have also recognized three narrow exceptions in which the statute of frauds will not be deemed to bar a broker's action to recover compensation or a commission from his or her principal, even where there is no written agreement for such.

First, an agent has a limited right to estop his or her principal from asserting the statute of frauds to "prevent either unconscionable injury or unjust enrichment," although the scope of this right depends on the identity

6

of the agent suing for a commission. (*Tenzer v. Superscope, Inc.* (1985) 39 Cal.3d 18, 27.) If the agent is offering to buy or sell real estate, he or she may assert estoppel only if the principal has engaged in "actual fraud." (*Phillippe*, *supra*, 43 Cal.3d at p. 1260.) Our Supreme Court has defined "actual fraud" as when (1) the principal has told the agent that their agreement for a commission was in writing when it was not, or (2) the principal has told the agent to cancel "an otherwise valid written contract" for exchange of the property while concurrently making an oral promise to the agent to still pay the commission, but then reneges on that promise. (*Id.* at pp. 1260, fn. 8, 1270; cf. *id.* at p. 1270 [principal's oral promise to execute a writing in the future; not fraud].) But if the agent is performing some other service covered by the statute of frauds, then the agent may assert estoppel whether or not the principal engaged in "actual fraud." (*Tenzer*, at p. 27.) Because, under California law, only licensed brokers may offer to buy or sell real estate (Bus. & Prof. Code, §§ 10131, subd. (a) [defining "broker" to include such persons] & 10130 [requiring all brokers to be licensed]), licensed brokers may only invoke an estoppel-based theory of relief if they demonstrate "actual fraud." This makes sense. Unlike everyone else, licensed brokers "obtain their license only after they demonstrate knowledge of laws relating to real estate transactions," including the statute of frauds. (*Margolin v. Shemaria* (2000) 85 Cal.App.4th 891, 899-900; *Phillippe*, at pp. 1260-1263; see generally Bus. & Prof. Code, §§ 10150-10153 [licensing requirements for brokers].) For this reason, licensed brokers are "conclusively presumed" to know that their commission agreements must be in writing to be enforceable. (*Phillippe*, at pp. 1261-1262; *Franklin v. Hansen* (1963) 59 Cal.2d 570, 575, overruled in part on other grounds by *Sterling v. Taylor* (2007) 40 Cal.4th 757 (*Sterling*).) Courts consequently have "little sympathy" for licensed brokers who assume the risk of relying on unwritten agreements for a commission. (*Phillippe*, at pp. 1261-1262.) More to the point, it is unreasonable for them to do so, which precludes them from invoking the doctrine of equitable estoppel except in cases of actual fraud. (*Id.* at p. 1262; see generally *Santa Monica Pines, Ltd. v. Rent Control Board* (1984) 35 Cal.3d 858, 867 ["reasonable reliance" required for equitable estoppel]; *Schafer v. City of Los Angeles* (2015) 237 Cal.App.4th 1250, 1261 [same].)

7

Second, a broker may effectively recover his commission if (1) the broker's principal and the other party have executed a written and binding agreement for the purchase of real estate, (2) the written agreement specifies that the broker will receive a commission, and (3) the broker's principal cancels the written agreement. In that instance, the broker may sue his principal for the damages equaling the lost commission on one of two alternate but reinforcing theories: (1) the principal has breached an "implied[] promise[] to complete the transaction so that the broker [could] recover the commission" (*Chan v. Tsang* (1991) 1 Cal.App.4th 1578, 1583 (*Chan*); *Super 7 Motel Associates v. Wang* (1993) 16 Cal.App.4th 541, 547); or (2) the broker is the third party beneficiary of the written agreement between the principal and the other party to the real estate transaction (*Donnellan v. Rocks* (1972) 22 Cal.App.3d 925, 930-932 (*Donnellan*); *Chan*, at p. 1583). (See generally *Herman v. Savage* (1936) 17 Cal.App.2d 238, 243-244 [awarding relief in these circumstances]; *Traxler v. Katz* (1931) 116 Cal.App. 226, 230-231 [same].) In either case, the broker is entitled to relief because the principal has by its own actions tried to avoid its obligation to the broker. (*Watson v. Aced* (1957) 156 Cal.App.2d 87, 92 ["[w]here a party to a contract prevents the fulfillment of a condition precedent or its performance by the adverse party, he cannot rely on such condition to defeat his liability"]; see generally *Moore v. Borgfeldt* (1929) 96 Cal.App. 306, 313 (*Moore*) ["[i]t is equally the policy of the law to protect a broker who has been so employed or authorized [to buy or sell property], and who, in good faith, has acted"].) One of the predicates for this exception—the existence of a binding, written contract for the purchase of property—dovetails neatly with the general rule that a broker earns his or her commission only after such a binding contract for the transfer of real estate comes into existence. (E.g., *R. J. Kuhl Corp. v. Sullivan* (1993) 13 Cal.App.4th 1589, 1600; *Seck v. Foulks* (1972) 25 Cal.App.3d 556, 572-573.)

Lastly, a broker may sue to collect a commission based on an unwritten agreement if the principal subsequently ratifies that agreement in writing. (*Coulter v. Howard* (1927) 203 Cal. 17, 23.)

8

Westside offers five arguments why the statute of frauds does not bar its claim for the $925,000 commission on the sale of the Bel Air estate. None of them has merit.

First, Westside seeks to recast the nature of its role and the nature of its claim in order to fit within the cases, explained above, holding that the statute of frauds does not apply to brokers who do something other than help with the purchase or sale of real estate and does not apply to disputes between brokers to divide a commission. (See *Owen*, *supra*, 115 Cal.App.2d at pp. 25-26; *Phillippe*, *supra*, 43 Cal.3d at pp. 1255-1256; *Goossen*, *supra*, 185 Cal.App.2d at p. 819.) However, the allegations set forth in the FAC foreclose this attempt at revisionism. As the basis for its claim against the Randalls, Westside expressly alleged in its FAC that "the Randalls engaged [Shapiro and Westside] to find them a residence to purchase." It is hard to see how this is anything but, in the words of the statute of frauds, "[a]n agreement authorizing or employing a[] . . . broker . . . to purchase . . . real estate." (§ 1624, subd. (a)(4).) And even if Westside provided the Randalls other unalleged services, those services would be "incidental" to the central purpose alleged in the FAC and thus of no consequence to the applicability of the statute of frauds. (*Phillippe*, at p. 1256.) Westside's lawsuit is also not a suit to divide a commission among brokers because Westside is suing its own principal, not the seller's broker or even Meaglia.

Second, Westside makes an argument that only Schrödinger's cat could appreciate when it simultaneously and paradoxically insists that it *is* and that it *is not* invoking the doctrine of equitable estoppel.[4] However, we need not delve into this irreconcilable dichotomy because even if Westside is relying on the doctrine, it is unavailable. Westside is a licensed broker, and this forecloses its *reasonable* reliance on an unwritten contract unless its principal committed actual fraud. (*Phillippe*, *supra*, 43 Cal.3d at pp. 1260, fn. 8, 1270.) Westside has not alleged any actual fraud, and the facts it has alleged do not involve the types of fraud our Supreme Court has previously

---

[4] In 1935, Austrian physicist Erwin Schrödinger hypothesized that a cat placed in an opaque box that would poison the cat half the time was both alive *and* dead (at least until someone opened the box to check whether the poison had been activated).

9

said qualify as "actual fraud" because the Randalls did not lie about whether the broker's agreement was in writing, and they did not tell Shapiro to cancel an "otherwise valid written contract" for the purchase of real estate with a concurrent promise to pay a commission anyway. (*Ibid.*)

Third, Westside tries to align itself with the exception for brokers who are permitted to recover when their principals enter into a written, binding real estate purchase contract that contemplates a commission for the broker, thereby obligating their principals to fulfill their implied promise to complete that transaction or their duty to pay the broker as a third-party beneficiary. (See *Chan*, *supra*, 1 Cal.App.4th at p. 1583; *Donnellan*, *supra*, 22 Cal.App.3d at pp. 930-932.) However, the entitlement to relief in these cases is premised on a necessary factual predicate—namely, a written, binding real estate purchase contract between the principal and the other party. (*Chan*, at p. 1583; *Donnellan*, at pp. 930-932.) That predicate is missing here. The Randalls never agreed to the two conditions in the seller's counteroffer to the Randalls' November 24, 2014 offer, and certainly never signed any written purchase agreement with the sellers while Shapiro was still their broker. These cases simply do not apply.

Fourth, Westside urges that its claim against the Randalls is not for the breach of an unwritten contract for a commission (which would be subject to the statute of frauds), but is instead for the breach of an implied-in-fact contract resulting in damages for the disruption of its *expectation* of a commission (which Westside argues is not subject to the statute). We reject this "semantic sleight-of-hand." (*Phillippe*, *supra*, 43 Cal.3d at p. 1256.) To be sure, a contract may be written, oral or inferred from the parties' conduct (the last being called an "implied-in-fact" contract).[5] (§§ 1619-1621; *Retired Employees Assn. of Orange County, Inc. v. County of Orange* (2011) 52 Cal.4th 1171, 1178; *Green Valley Landowners Assn. v. City of Vallejo* (2015) 241 Cal.App.4th 425, 433.) But the statute of frauds applies to *any* "agreement

---

[5] Contracts may also be "implied in law," but such contracts are not created by the parties; they are created by the courts to avoid unjust enrichment. (*Unilab Corp. v. Angeles-IPA* (2016) 244 Cal.App.4th 622, 639.) Except as described above, courts will not imply contracts at law as a means of sidestepping the statute of frauds.

authorizing or employing a[] . . . broker . . . to purchase or sell real estate, . . . or to procure, introduce, or find a purchaser or seller of real estate"—regardless of how that agreement came to be. (§ 1624, subd. (a)(4).) Thus, the fact that Westside is now asserting that its agreement with the Randalls is implied by conduct rather than an express, oral agreement is irrelevant. How Westside characterizes its damages is also irrelevant. Whether Westside labels the relief it seeks as a commission or the "expectation of a commission," Westside is seeking the very same amount— that is, the amount of the commission specified in the alleged, unwritten contract. Were we to accept Westside's arguments, we would be empowering brokers to evade the statute of frauds by the mere expedient of calling their claims for the breach of an unwritten agreement for a commission by some other name. This not only ignores the age-old wisdom that "'if an object looks like a duck, walks like a duck and quacks like a duck, it is likely to be a duck'" (*Phillippe*, at p. 1256), but would also effectively repeal this provision of the statute of frauds, something only the Legislature may do (*id.* at p. 1265; *Southern Cal. Etc. Assemblies of God v. Shepherd of Hills Etc. Church* (1978) 77 Cal.App.3d 951, 958 [statute of frauds cannot be "nullified" by "'transparent device[s]'"].)

Lastly, Westside argues that the statute of frauds does not apply because it is not seeking to collect its commission from the Randalls, but instead from the *seller* of the Bel Air estate because the initial listing indicated that the buyer's "cooperating broker's fee" was to come from the seller's broker. We reject this argument for several reasons. If we accept this argument at face value, Westside's lawsuit would have to be dismissed because Westside is suing the wrong party: The Randalls are not the seller's broker. Even if we assume that the commission Westside seeks was supposed to originate with the seller's broker and be passed through the Randalls to Westside, there is still no written agreement between the Randalls and Westside and nothing in the plain language of the statute of frauds indicates that its applicability turns on where the money for a commission came from originally. Accepting Westside's argument would also create a mile-wide exception to the statute of frauds: The commissions paid to both parties' brokers "generally" originate with the seller (*Chan*, *supra*, 1

11

Cal.App.4th at p. 1583), so if all it took to evade the statute of frauds was saying that the funds had to come from the seller, the statute would be inapplicable in nearly every case brought by a buyer's broker.

For all these reasons, we conclude that the trial court was correct in ruling that the statute of frauds applies to Westside's claim.

**B.      *Is there a writing that satisfies the requirements of the statute of frauds?***

If an agreement is subject to the statute of frauds, the broker seeking to collect its commission must produce a "contract[] . . . or some note or memorandum thereof . . . in writing and subscribed by the party to be charged or by the party's agent." (§ 1624, subd. (a).)  To satisfy this requirement, a broker must present a "writing" (1) that "unequivocally show[s] on its face the fact of employment of the broker seeking to recover a real estate commission" (*Phillippe*, *supra*, 43 Cal.3d at p. 1258; *Pacific Southwest Development Corp. v. Western P. R. Co.* (1956) 47 Cal.2d 62, 68-69); and (2) that is signed by the principal or its agent (*Marks*, *supra*, 33 Cal.2d at pp. 819-820).  The writing need not memorialize the entire contract between the principal and broker (*Rader Co. v. Stone* (1986) 178 Cal.App.3d 10, 21; *Moore*, *supra*, 96 Cal.App. at p. 313), and need not be signed by all parties to the real estate transaction (*Torelli v. J. P. Enterprises, Inc.* (1997) 52 Cal.App.4th 1250, 1253, 1256 [seller's counteroffer containing promise to pay broker a commission suffices to allow suit against seller, even though buyer never accepted counteroffer]).  A memorandum summarizing the contract will suffice as long as it sets forth the *fact* of employment or authority to act. (*Beazell*, *supra*, 59 Cal.2d at p. 580; *Friddle v. Epstein* (1993) 16 Cal.App.4th 1649, 1655; *Lathrop v. Gauger* (1954) 127 Cal.App.2d 754, 764; *Rader Co.*, at p. 25.)  The amount of compensation and a specific promise to pay the same need not be included in the writing (*Beazell*, at pp. 580-581; *Barcelon v. Cortese* (1968) 263 Cal.App.2d 517, 526 (*Barcelon*); cf. *Barcelon*, at pp. 526-527 ["a statement by the seller that he will pay the regular commission as part of the condition of the sale does not make the writing sufficient to satisfy the statute" absent language showing employment or authorization]), and may be supplied by oral evidence or inferred from custom (*Friddle*, at pp. 1656-1657; *Lathrop*, at p. 765).  Whether a writing is sufficient is a question of law we review de novo.  (*Sterling*, *supra*, 40 Cal.4th at p. 772.)

12

The FAC alleges no written agreement between Westside and the Randalls meeting these requirements.

As such, the trial court properly ruled that Westside's claim for its commission is subject to—and barred by—the statute of frauds.

## II. Reasonable Possibility of Amendment

Westside argues that the trial court abused its discretion in denying leave to amend its claim against the Randalls because Westside can allege that the October 24, 2014 and November 24, 2014 offers it made to the sellers on the Bel Air estate as well as other unspecified e-mails and writings, constitute written agreements sufficient to satisfy the requirements of the statute of frauds. We disagree for two reasons.

First, and as explained above, it is not enough that the October and November 2014 offers or the other writings mention Westside's entitlement to a commission. (*Barcelon*, *supra*, 263 Cal.App.2d at pp. 526-527.) To be sufficient, they must set forth the fact that Westside is the Randalls' agent or in their employ. (E.g., *Beazell*, *supra*, 59 Cal.2d at p. 580.) Given that Westside has already had two opportunities to allege such facts and has not done so, we harbor significant doubts that the offers or other writings actually contain such language.

Second, and even if Westside can credibly allege that the two written offers or other writings do contain the required verbiage, Westside is not entitled to the commission because it is not the procuring cause of the sale that ultimately went through. (*Brea v. McGlashan* (1934) 3 Cal.App.2d 454, 465 ["the rule is that if an agent (or broker) is the inducing or procuring cause of the contract, he is entitled to the commission"]; *Sessions v. Pacific Improvement Co.* (1922) 57 Cal.App. 1, 17.) ""A broker is the 'procuring cause' of a real estate transaction if he finds a purchaser [or seller] who is ready, willing, and able to buy [or sell] the property on the terms stated and he obtains a valid contract obligating the purchase [or seller] on these terms.""" (*Phillippe*, *supra*, 43 Cal.3d at p. 1263, fn. 11.) This rule applies even when multiple brokers are involved: "[I]t is not enough that [a] broker contributes indirectly or incidentally to the sale by imparting information which tends to arouse interest. [The broker seeking to collect the commission] must set in motion a chain of events, which, without break in

their continuity, cause the buyer and seller to come to terms as the proximate result of his peculiar activities." (*Sessions*, at p. 17.) Although the question of procuring cause is often a question of fact, it is a question of law when the facts are undisputed. (*Brea*, at pp. 465-466; cf. *Rose v. Hunter* (1957) 155 Cal.App.2d 319, 323.)

Here, the facts alleged in the FAC establish that Westside was not the procuring cause of the Randalls' subsequent purchase of the Bel Air estate in the spring of 2015. To be sure, Westside has alleged that Shapiro found the Bel Air estate, invested his time in making multiple offers and counteroffers, and even "worked . . . through the night to finalize the terms" of a purchase agreement. But it is also undisputed that the sellers rejected the Randalls' October 24, 2014 and November 24, 2014 offers by making counteroffers; that Meaglia took over the negotiations for some period of time; and that the Randalls eventually purchased the Bel Air estate on different terms than those they offered through Shapiro—namely, for $1.25 million *more* than the November 24, 2014 offer (an amount that does not even correspond with Meaglia's willingness to credit his $925,000 commission toward the purchase price).

Over a century ago, the Court of Appeal held: "Merely putting a prospective purchaser on the track of property which is on the market will not suffice to entitle the broker to the commission contracted for, and even though a broker opens negotiations for the sale of the property, he will not be entitled to a commission if he finally fails in his efforts, without fault or interference of the owner, to induce a prospective purchaser to buy or make an offer to buy, notwithstanding that the owner may subsequently, either personally or through the instrumentality of other brokers, sell the same property to the same individual at the price and upon the terms for which the property was originally for sale." (*Cone v. Keil* (1912) 18 Cal.App. 675, 679-680.) This holding is just as valid today, and renders futile any amendment by Westside.

14

## DISPOSITION

The judgment is affirmed.  The Randalls are entitled to their costs on appeal.

**CERTIFIED FOR PUBLICATION.**


_____, J.

HOFFSTADT

We concur:

_____, P. J.

BOREN

_____, J.

CHAVEZ